## Income Tax Cases.

State ex rel. Bolens vs. Frear, Secretary of State, and others.

Winding and others, Appellants, vs. Frear, Secretary of State, and others, Respondents.

*November 20, 1911—March 12, 1912.*

Supreme Court: Jurisdiction.   (1–15) *Original jurisdiction, when exercised: Questions* publici juris: *Prerogative writs: Actions by the state: Private relators: Taxpayers' actions: Restraining expenditures by state officers under invalid statute: Questions determined.*

Circuit Courts: Jurisdiction.   (10) *Injunction: Prerogative writs.* (35) *Taxpayers' actions.*

Taxation of Incomes: Constitutional Law.   (16–34) *Equal protection of the laws: Double taxation: Land and income therefrom: Classification: Different rates: Progressive rates: Exemptions: Nonresidents: Partnerships: Corporations: Corporate bonds: What included in "income:" Rental value of residence: Income of wife and children: Officers: Local self-government: Assessors of incomes, how elected or appointed: Tax commission: Delegation of legislative power.*

Statutes.   (15, 20, 29–34) *Construction: Partial invalidity: Retroactive law.*

1. Actions against the state, brought in the supreme court by virtue of the consent of the state given in sec. 3200, Stats. (1898), are not within the purview of the decision in this case, and nothing said in the opinion is to be construed as having any bearing on that section or actions under it.

2. The original jurisdiction of the supreme court is a jurisdiction reserved for the use of the state itself when it appears to be necessary to vindicate or protect its prerogatives or franchises or the liberties of its people: the state uses it to punish or prevent wrongs to itself or to the whole people.

3. The state in such a case is always the plaintiff and the only plaintiff, whether the action be brought by the attorney general or, against his consent, on the relation of a private individual under the permission and direction of the court. The private relator is a mere incident; he brings the public injury to the attention of the court, and the court by virtue of the power granted by the constitution commands that the suit be brought by and for the state.

4. Cases falling within the following general classes have been held to be properly within the original jurisdiction of the supreme court, i. e., those in which (1) a citizen is wrongfully deprived of his liberty; (2) a state office has been usurped; (3) a franchise grantable only by the state has been usurped, abused, or forfeited; (4) a law regulating public-service corporations in the interests of the people is systematically disobeyed and set at naught; (5) a navigable river which the state is bound to keep open as a highway for all is obstructed or encroached upon, or a public railroad built under a charter granted by the state is about to be destroyed; (6) a state officer declines to perform a ministerial duty in the performance of which the people at large have a material interest; (7) a state officer is about to perform an official act materially affecting the interests of the people at large, which is contrary to law or imposed upon him by the terms of a law which violates constitutional provisions; (8) the situation is such, in a matter *publici juris*, that the remedy in the lower courts is entirely lacking or absolutely inadequate, and hence jurisdiction must be taken or justice will be denied.

5. It is not meant by this classification that cases may not arise which will call for the exercise of the original jurisdiction, although they may not fall within either of the classes named.

6. A case, although involving a question *publici juris*, will not come within the original jurisdiction if it be only local in its effect, subject only to the exception named in the eighth class above mentioned.

7. A case involving a mere private interest, or one whose primary purpose is to redress a private wrong, will not be entertained.

8. A case will not be dismissed, however, because there is a private interest involved with the public interest, provided the private interest be incidental merely and the vindication of the public right be the primary purpose of the action.

9. An action involving a private as well as a public interest will not be dismissed merely because the private interest may drop out, provided the public and private interests be severable and the public interest still exists.

10. The constitution has not given the circuit court the power to use the writ of injunction as a prerogative jurisdictional writ, as it has been given to the supreme court; hence the circuit court has not the power, in an action not brought by the attorney general but on the relation of a private individual, to use the writ for prerogative purposes.

11. A taxpayer's action (as that action is known in the circuit court) wherein the taxpayer himself is the actual party, representing not the whole people or the state but a comparatively limited class, is not within the original jurisdiction of the supreme court.

12. The original jurisdiction may, however, properly be used at the instance and upon the relation of a private individual to stay by proper writ the expenditure of the state's funds for purposes expressly or by necessary implication forbidden by the constitution; but the action in such a case is the action of the state, not the action of the taxpaying relator.

13. Where state officials are about to spend the state's money in executing an unconstitutional law, an action may, by leave of the court, be brought in the name of the state to prevent the threatened misapplication of its funds; but the court will judge of the exigency in each case, and will endeavor to guard against the use of its original jurisdiction in trifling cases or to accomplish ulterior purposes.

14. The income tax law (ch. 658, Laws of 1911) makes such a sweeping change in general taxation policy and in methods of taxation throughout the state, and the resulting confusion would be so great if, after being in operation for a year or two, it should be held invalid, that a serious question as to the constitutionality of the law is a question seriously affecting the prerogatives of the state and the liberties of the people, and justifies the exercise of the original jurisdiction of the supreme court in an action, brought for the purpose of testing the validity of the law, to restrain administrative officers from expending state moneys in executing the same.

15. In such an action only those questions will be determined which may be considered as relating to the validity of the whole act, leaving for future consideration, as concrete cases may arise, the questions relating to the validity of minor provisions as to matters of detail.

16. Under sec. 1, art. VIII, Const., as amended, taxation of property and taxation of incomes are recognized as separate and distinct things, and both are permitted.

17. The taxation of land itself and also of the income derived therefrom, as provided in ch. 658, Laws of 1911, does not violate the XIVth amendment, Const. of U. S., guaranteeing "equal protection of the laws."

18. Said XIVth amendment does not lay upon the states an unbending rule of equal taxation: they may make exemptions, levy different rates upon different classes, tax such property as they choose, and make such deductions as they choose, so long as they obey their own constitutions and proceed within reasonable limits and general usage.

19. The progressive feature in the taxation of incomes under ch. 658, Laws of 1911, by which the rate is graduated according to the size of the taxable income, is expressly authorized by the state constitution and is not within the inhibition of the XIVth amendment, Const. of U. S.

20. Whether, under sec. 2, art. IV, Const. of U. S. (providing that the "citizens of each state shall be entitled to all privileges and immunities of citizens in the several states"), the provisions of ch. 658, Laws of 1911, which deny to nonresidents exemptions which are allowed to residents are valid, is not determined. If invalid, their invalidity does not affect the act as a whole.

21. The provision in said act which allows an assessment against a nonresident to be increased without notice, although in case of a resident notice must be given, does not violate sec. 2, art. IV, Const. of U. S.

22. The office of assessor of incomes, provided for in the act, is not a county, city, town, or village office, nor is it an office which existed in substance when the state constitution was adopted or which is essential to the existence or efficiency of either of the said municipal divisions. It is therefore not covered by the guaranties of local self-government found in sec. 4, art. VI, and sec. 9, art. XIII, Const.; and under the latter section such assessors may be elected or appointed in any way the legislature may direct.

23. It is not a delegation of legislative power to vest in the state tax commission, by law, the power of appointing assessors of incomes and fixing their salaries.

24. A classification by which exemptions allowed to individuals are denied to partnerships is based upon substantial differences between classes, does not involve unjust discrimination, and is valid.

25. So, also, a classification under which an exemption of life insurance to the amount of $10,000 is allowed to one legally dependent on the deceased, though denied to other persons, is valid.

26. The provision that a taxpayer who has paid a personal property tax for the year may have the amount so paid credited upon his income tax, does not involve any invalid classification.

27. Income, within the meaning of sec. 1, art. VIII, Const., as amended, need not be money, but may be that which is convertible into money; and the estimated rental of residence property occupied by the owner thereof may properly, as provided in the act, be taxed as a part of the owner's income.

28. The provision that the income of a wife living with her husband shall be added to his income, and the income of each child under eighteen years of age living with its parents shall be added to that of the parents, involves a classification based on substantial differences and is valid.

29. Neither the fact that incomes for the entire year 1911 are to be taxed, although the law did not go into effect until July 15th of that year, nor the fact that profits derived from the sale of property purchased at any time within three years previously are to be included, renders the law retroactive or void.

30. Whether the provision (in sec. 1087m—22) that the income of a resident of the state derived from different political subdivisions thereof shall be combined for the purpose of determining the exemptions and the rate, while the income of a nonresident is to be separately assessed and taxed in each of the municipalities from which it is derived—thus discriminating in some instances against residents by subjecting their incomes in part to higher rates,—is in violation of sec. 2, art. IV, Const. of U. S., not determined.

31. That part of sec. 1087m—6 which provides a rate of taxation for the incomes of corporations different from the rate prescribed for individuals, involves a classification based upon substantial differences and is valid.

32. Although the act in terms includes all corporations and does not specifically except national banks nor name the officers whose salaries cannot be constitutionally taxed, that fact does not invalidate it. If national banks or any public officers cannot constitutionally be subjected to the tax the law will be construed as not applying to them.

33. Whether the provisions, in sec. 1087m—2, under which the incomes of nonresidents are to be taxed so far as derived from sources within the state, and incomes derived from business interstate in its character are to be taxed on that portion thereof which is derived from business transacted and property located in the state (to be ascertained as therein stated), are valid, is not determined.

34. Whether the provision, in sec. 1087m—3 (b), that a portion of the interest on corporate bonds (to be ascertained as therein

provided) shall be taxed against the bondholders, and if not paid by them shall be enforced against the corporation and may then be deducted from the next interest payment on the bonds, is valid, not determined.

35. No taxpayers' action against auditing or disbursing officers of the state, to prevent them from paying moneys out of the state treasury, can be maintained in the circuit court.

MARSHALL, J., dissents in part.

TIMLIN, J., dissents in part.

KERWIN and BARNES, JJ., took no part in the decision of the question of jurisdiction.

ORIGINAL ACTION brought in this court on the relation of *Harry W. Bolens* against *James A. Frear,* Secretary of State, and others; also

APPEAL from an order of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

The facts are stated in the opinion.

For the relator, *Bolens,* there was a brief by *Carpenter & Poss,* and oral argument by *Benjamin Poss.*

For the appellants *Winding* and others there was a brief by *Flanders, Bottum, Fawsett & Bottum,* attorneys, and a separate brief by *Geo. D. Van Dyke,* of counsel, and oral argument by *J. G. Flanders, C. F. Fawsett,* and *Geo. D. Van Dyke.*

In support of the various contentions as to the invalidity of ch. 658, Laws of 1911, there were cited, in the briefs above mentioned, the following, among other authorities: *Pollock v. Farmers' L. & T. Co.* 157 U. S. 429, 580, 581, 15 Sup. Ct. 673; *Brown v. Maryland,* 12 Wheat. 419, 444; *Weston v. Charleston,* 2 Pet. 449; *Dobbins v. Comm'rs,* 16 Pet. 435; *Kennard v. Manchester,* 68 N. H. 61, 36 Atl. 553; *Second Ward Sav. Bank v. Milwaukee,* 94 Wis. 587, 595, 69 N. W. 359; *Kingsley v. Merrill,* 122 Wis. 185, 200, 99 N. W. 1044; *Philadelphia & S. S. Co. v. Pennsylvania,* 122 U. S. 326, 7 Sup. Ct. 1118; *Black v. State,* 113 Wis. 205, 89 N. W. 522; *Magoun v. Ill. T. & S. Bank,* 170 U. S. 283, 18 Sup. Ct. 594; *Kochersperger v. Drake,* 167 Ill. 122, 47 N. E. 321; *Estate*

*of Cope,* 191 Pa. St. 1, 21, 43 Atl. 79; *Estate of Mahoney,*
133 Cal. 180, 65 Pac. 389; *Huber v. Martin,* 127 Wis. 412,
434, 105 N. W. 1031, 1135; *Yick Wo v. Hopkins,* 118 U. S.
356, 369, 6 Sup. Ct. 1064; *Bell's Gap R. Co. v. Pennsylvania,*
134 U. S. 232, 237, 10 Sup. Ct. 533; *Slauson v. Racine,* 13
Wis. 398; *State ex rel. Dwinnell v. Gaylord,* 73 Wis. 316,
325, 41 N. W. 521; *O'Connor v. Fond du Lac,* 109 Wis. 253,
264, 265, 85 N. W. 327; *Rathbone v. Wirth,* 150 N. Y. 459,
469, 45 N. E. 15; 8 Cyc. 779 *et seq.; State ex rel. Williams
v. Samuelson,* 131 Wis. 499, 111 N. W. 712; *Union R. T. Co.
v. Kentucky,* 199 U. S. 194, 26 Sup. Ct. 36; *Selliger v. Ken-
tucky,* 213 U. S. 200, 29 Sup. Ct. 429; *Metropolitan L. Ins.
Co. v. New Orleans,* 205 U. S. 395, 27 Sup. Ct. 499; *Buck v.
Beach,* 206 U. S. 392, 400, 27 Sup. Ct. 712; *State Tax on
Foreign-held Bonds,* 15 Wall. 300, 319; *Chicago & N. W. R.
Co. v. State,* 128 Wis. 553, 108 N. W. 557; *Beals v. State,*
139 Wis. 544, 121 N. W. 347; 37 Cyc. 811; *Wis. Cent. R.
Co. v. Taylor Co.* 52 Wis. 37, 87, 8 N. W. 833; *Knowlton v.
Moore,* 178 U. S. 41, 82, 20 Sup. Ct. 747; *State ex rel. Wink-
ler v. Benzenberg,* 101 Wis. 172, 76 N. W. 345; *Essex Co.
Park Comm. v. West Orange,* 77 N. J. Law, 575, 73 Atl. 511,
512; *State v. Whitcom,* 122 Wis. 110, 99 N. W. 468; *State
ex rel. Risch v. Trustees,* 121 Wis. 44, 98 N. W. 954; *Phipps
v. Wis. Cent. R. Co.* 133 Wis. 153, 113 N. W. 456; *South
Nashville St. R. Co. v. Morrow,* 87 Tenn. 406, 11 S. W. 348,
2 L. R. A. 853; *Ward v. Maryland,* 12 Wall. 418; *Sprague
v. Fletcher,* 69 Vt. 69, 37 Atl. 239; 37 L. R. A. 840; *In re
Stanford's Estate,* 126 Cal. 112, 54 Pac. 259; *Oliver v. Wash-
ington Mills,* 11 Allen, 268; *Connolly v. Union S. P. Co.* 184
U. S. 540, 560, 561, 567, 22 Sup. Ct. 431; *Clark v. Kansas
City,* 176 U. S. 114, 119, 20 Sup. Ct. 284; *Cotting v. Kansas
City S. Y. Co.* 183 U. S. 79, 22 Sup. Ct. 30; *Gulf, C. & S. F.
R. Co. v. Ellis,* 165 U. S. 150, 159, 160, 17 Sup. Ct. 255;
*W. C. Peacock & Co. v. Pratt,* 121 Fed. 772, 776; *Northern
Pac. R. Co. v. Walker,* 47 Fed. 681; *Philadelphia F. Asso. v.*

*New York,* 119 U. S. 110, 120, 121, 7 Sup. Ct. 108; *San Mateo Co. v. Southern Pac. R. Co.* 13 Fed. 722, 733; *Nunnemacher v. State,* 129 Wis. 190, 223, 108 N. W. 627; *People v. Raymond,* 37 N. Y. 428; *State ex rel. Hessey v. Daniels,* 143 Wis. 649, 128 N. W. 565; *Kirtland v. Hotchkiss,* 100 U. S. 491, 498; *New Orleans v. Stempel,* 175 U. S. 309, 20 Sup. Ct. 110; *Tappan v. Merchants' Nat. Bank,* 19 Wall. 490; *Orleans Parish v. New York L. Ins. Co.* 216 U. S. 517, 523, 30 Sup. Ct. 385; *U. S. v. Erie R. Co.* 106 U. S. 327, 1 Sup. Ct. 223; *Hartman v. Greenhow,* 102 U. S. 672, 684; *Owensboro Nat. Bank v. Owensboro,* 173 U. S. 664, 19 Sup. Ct. 537; *Opinion of the Justices,* 53 N. H. 634; *Dyer v. Melrose,* 197 Mass. 99, 83 N. E. 6; *Dyer v. Melrose,* 215 U. S. 594, 30 Sup. Ct. 410; *Hamilton v. Fond du Lac,* 25 Wis. 496; *Richards v. Tarr,* 42 Kan. 547, 22 Pac. 557.

For the defendants and respondents there was a brief by the *Attorney General* and *Russell Jackson,* deputy attorney general; a separate brief by *J. E. Dodge,* special counsel for the state; separate briefs by *Geo. G. Greene,* counsel; and oral argument by *Mr. Jackson, Mr. Dodge,* and *Mr. Greene.* They cited, besides other cases, *Glasgow v. Rowse,* 43 Mo. 479; *Wilcox v. County Comm'rs,* 103 Mass. 544; *Drexel & Co. v. Comm.* 46 Pa. St. 31; *Comm. v. Brown,* 91 Va. 762, 21 S. E. 357; *New Orleans v. Hart,* 14 La. Ann. 803; *W. C. Peacock & Co. v. Pratt,* 121 Fed. 772; *Wintz v. Gerardey,* 31 La. Ann. 381, 388; *Waring v. Mayor, etc.* 60 Ga. 93, 99; *Alderman v. Wells,* 85 S. C. 507, 67 S. E. 781; Seligman, Income Tax, ch. 5, and cases cited; Kennan, Income Taxation, ch. 1; *Black v. State,* 113 Wis. 205, 89 N. W. 522; *Nunnemacher v. State,* 129 Wis. 190, 108 N. W. 627; *Beals v. State,* 139 Wis. 544, 121 N. W. 347; *Magoun v. Ill. T. & S. Bank,* 170 U. S. 283, 18 Sup. Ct. 594; *Billings v. Illinois,* 188 U. S. 97, 104, 23 Sup. Ct. 272; *Blackstone v. Miller,* 188 U. S. 189, 23 Sup. Ct. 277; *Clark v. Titusville,* 184 U. S. 329, 22 Sup. Ct. 382; *Kochersperger v. Drake,* 167 Ill. 122, 47 N. E.

321; *Knowlton v. Moore,* 178 U. S. 41, 20 Sup. Ct. 747;
*Flint v. Stone Tracy Co.* 220 U. S. 107, 31 Sup. Ct. 342; *In
re Appointment of Revisor,* 141 Wis. 592, 124 N. W. 670;
*Ex parte Gerino,* 143 Cal. 412, 77 Pac. 166; 23 Am. & Eng.
Ency. of Law (2d ed.) 328, 342, 394; 27 id. 603, 618; *Chi-
cago & N. W. R. Co. v. State,* 128 Wis. 553, 108 N. W. 557;
*State v. Bullen,* 143 Wis. 512, 128 N. W. 109; *Matter of Cor-
nell,* 170 N. Y. 423, 63 N. E. 445; *Frothingham v. Shaw,*
175 Mass. 59, 55 N. E. 623; *Liverpool & L. & G. Ins. Co. v.
Board,* 221 U. S. 346, 356, 31 Sup. Ct. 550; 37 Cyc. 802,
805, 824; *Metropolitan L. Ins. Co. v. New Orleans,* 205 U.
S. 395, 27 Sup. Ct. 499; *New Orleans v. Stempel,* 175 U. S.
309, 20 Sup. Ct. 110; *Kidd v. Alabama,* 188 U. S. 730, 23
Sup. Ct. 401; *Bristol v. Washington Co.* 177 U. S. 133, 20
Sup. Ct. 585; *Bonaparte v. Tax Court,* 104 U. S. 592; *Simp-
son v. Hopkins,* 82 Md. 478, 33 Atl. 714; *People v. M. S. &
N. I. R. Co.* 4 Mich. 398; *U. S. v. Erie R. Co.* 106 U. S. 327,
1 Sup. Ct. 223; *Railroad Co. v. Collector,* 100 U. S. 595;
*State Railroad Tax Cases,* 92 U. S. 575, 607; *Blackstone v.
Miller,* 188 U. S. 189, 204, 23 Sup. Ct. 277; *Bell's Gap
R. Co. v. Pennsylvania,* 134 U. S. 232, 10 Sup. Ct. 533;
*Savings & L. Soc. v. Multnomah Co.* 169 U. S. 421, 427, 18
Sup. Ct. 392; *Society for Savings v. Coite,* 6 Wall. 607;
*Kidd v. Alabama,* 188 U. S. 730, 733, 23 Sup. Ct. 401, 402;
Cooley, Taxation (3d ed.) 387 *et seq.; St. Joseph v. Ernst,*
95 Mo. 360, 367, 8 S. W. 558; *Drexel v. Comm.* 46 Pa. St.
31; Cooley, Const. Lim. (2d ed.) 291, 309; *Stockdale v. Ins.
Cos.* 20 Wall. 323, 331; *Schuylkill Nav. Co. v. Elliott,* 21
Fed. Cas. 762; *U. S. Trust Co. v. New Mexico,* 183 U. S.
535, 22 Sup. Ct. 172; *Flanders v. Merrimack,* 48 Wis. 567,
4 N. W. 741; *Morrow v. Green Bay,* 55 Wis. 112, 12 N. W.
437; *People ex rel. Metropolitan St. R. Co. v. Tax Comm'rs,*
199 U. S. 1, 46, 47, 25 Sup. Ct. 705; *Tucker v. Ferguson,* 22
Wall. 527; *Delaware Railroad Tax,* 18 Wall. 206; *Hoge v.
R. & D. R. Co.* 99 U. S. 348; *Davidson v. New Orleans,* 96

U. S. 97; *Memphis G. L. Co. v. Taxing Dist.* 109 U. S. 398,
3 Sup. Ct. 205; *Merchants' & M. Bank v. Pennsylvania,* 167
U. S. 461, 463, 17 Sup. Ct. 829; *Travellers' Ins. Co. v. Con-
necticut,* 185 U. S. 364, 371, 372, 22 Sup. Ct. 673; *State v.
Clement Nat. Bank,* 84 Vt. 167, 78 Atl. 944, 952; Cooley;
Const. Lim. (7th ed.) 574; *Paul v. Virginia,* 8 Wall. 168,
180; *McKane v. Durston,* 153 U. S. 684, 687, 14 Sup. Ct.
913; *Duryea v. Muse,* 117 Wis. 399, 406, 407, 94 N. W. 365;
*London County Council v. Att'y Gen.* [1901] App. Cas. 26,
45; *Ystradyfodwg & P. M. S. B. v. Bensted,* [1907] App.
Cas. 264; *Tennant v. Smith,* [1892] App. Cas. 150, 164;
*Corke v. Fry,* 32 Scot. L. Rep. 341, 3 Tax Cas. 335; *Mc-
Dougall v. Sutherland,* 31 Scot. L. Rep. 630, 3 Tax Cas.
261; Pratt & Redman, Income Tax Law (8th ed.) 1, 13, 14,
note.

A brief was filed by *F. C. Winkler,* as *amicus curiæ,* upon
the question whether the court has or should exercise jurisdic-
tion in these actions.

In a brief filed by *Miller, Mack & Fairchild,* as *amici
curiæ,* they contended that the tax imposed by ch. 658, Laws
of 1911, is levied directly upon receipts from interstate and
foreign commerce, and is therefore a regulation of interstate
and foreign commerce, in violation of sec. 8, art. I, Const. of
U. S. *Fargo v. Michigan,* 121 U. S. 230, 7 Sup. Ct. 857;
*Philadelphia & S. S. Co. v. Pennsylvania,* 122 U. S. 326, 7
Sup. Ct. 1118; *Galveston, H. & S. A. R. Co. v. Texas,* 210 U.
S. 217, 28 Sup. Ct. 638; *Western Union T. Co. v. Kansas,*
216 U. S. 1, 30 Sup. Ct. 190; *State ex rel. Carr v. Woodruff
S. & P. C. Co.* 114 Ind. 155, 15 N. E. 814; *Northern Pac. R.
Co. v. Raymond,* 5 Dak. 356, 40 N. W. 538; *Vermont & C.
R. Co. v. Vermont Cent. R. Co.* 63 Vt. 1, 21 Atl. 262, 731;
*Delaware & H. C. Co. v. Comm.* 1 Pa. Sup. Ct. Cas. 36, 17
Atl. 175; *People ex rel. C. T. R. Co. v. Miller,* 178 N. Y.
194, 70 N. E. 472. The scheme of taxation proposed by the
act is necessarily a tax upon gross receipts. In other words,

the word "income," as used in the act, means practically gross receipts, not profits. *People v. Sup'rs,* 4 Hill (N. Y.) 20, 23; *Mundy v. Van Hoose,* 104 Ga. 292, 30 S. E. 783, 786; *Reg. v. Comm'rs,* L. R. 4 H. L. 449, 470, 483, 39 L. J. Q. B. 253, 23 L. T. Rep. n. s. 111; *Jones v. Ogle,* L. R. 8 Ch. App. 192, 196, 42 L. J. Ch. 334, 27 L. T. Rep. n. s. 367; *In re West Riding of Y. P. B. B. Soc.* 43 Ch. D. 407, 415, 59 L. J. Ch. 197, 62 L. T. Rep. n. s. 486.

*David S. Wegg,* as *amicus curiæ,* argued, among other things, that any tax imposed upon interest coupons or dividends upon stock in the hands of nonresidents is extraterritorial, not within the jurisdiction of the taxing power, and void. The *situs* of such intangible property is in the domicile of the owner. It is not here and cannot be taxed here. *State ex rel. Dwinnell v. Gaylord,* 73 Wis. 316, 41 N. W. 521; *Renier v. Hurlbut,* 81 Wis. 24, 50 N. W. 783; *Bragg v. Gaynor,* 85 Wis. 468, 482, 55 N. W. 919; *Parker v. Stoughton M. Co.* 91 Wis. 174, 180, 64 N. W. 751; *Perrigo v. Milwaukee,* 92 Wis. 236, 65 N. W. 1025; *Kingsley v. Merrill,* 122 Wis. 185, 99 N. W. 1044; *State v. Bullen,* 143 Wis. 512, 128 N. W. 109; *Railroad Co. v. Jackson,* 7 Wall. 262, 267, 268; *St. Louis v. Ferry Co.* 11 Wall. 423; *State Tax on Foreign-held Bonds,* 15 Wall. 300, 319, 320; *Bailey v. Railroad Co.* 22 Wall. 604; *Murray v. Charleston,* 96 U. S. 432; *Kirtland v. Hotchkiss,* 100 U. S. 491; 106 U. S. (Appendix) 704; *New Orleans v. Houston,* 119 U. S. 265, 7 Sup. Ct. 198; *New York, L. E. & W. R. Co. v. Pennsylvania,* 153 U. S. 628, 648, 14 Sup. Ct. 952; *Savings & L. Soc. v. Multnomah Co.* 169 U. S. 421, 426–428, 18 Sup. Ct. 392; *New Orleans v. Stempel,* 175 U. S. 309, 20 Sup. Ct. 110; *Bristol v. Washington Co.* 177 U. S. 133, 141, 143, 20 Sup. Ct. 585; *State Board v. Comptoir Nat. d'Escompte,* 191 U. S. 388, 402, 404, 24 Sup. Ct. 109; *Fargo v. Hart,* 193 U. S. 490, 499, 24 Sup. Ct. 498; *Pennsylvania L. Mut. F. Ins. Co. v. Meyer,* 197 U. S. 407, 416, 25 Sup. Ct. 483; *Union R. T. Co.*

*v. Kentucky,* 199 U. S. 194, 26 Sup. Ct. 36; *Metropolitan L. Ins. Co. v. New Orleans,* 205 U. S. 395, 27 Sup. Ct. 499; *Buck v. Beach,* 206 U. S. 392, 406, 407, 27 Sup. Ct. 712; *Liverpool & L. & G. Ins. Co. v. Board,* 221 U. S. 346, 31 Sup. Ct. 550; *Boyd v. Selma,* 96 Ala. 144, 11 South. 393, 16 L. R. A. 729; *North Carolina R. Co. v. Comm'rs,* 91 N. C. 454; *Oliver v. Washington Mills,* 11 Allen, 268. The provisions of the income tax law applied to nonresident holders of shares of stock in railway companies, corporations of Wisconsin, are invalid. _If the tax is on the dividends or profits derived from such shares of stock, then it is a tax on the shares themselves. *Railroad Co. v. Jackson,* 7 Wall. 262; *Weston v. Charleston,* 2 Pet. 449; *Almy v. California,* 24 How. 169; *Dobbins v. Comm'rs,* 16 Pet. 435; *Fairbank v. U. S.* 181 U. S. 283, 21 Sup. Ct. 648; *Selliger v. Kentucky,* 213 U. S. 200, 29 Sup. Ct. 449; *Brown v. Maryland,* 12 Wheat. 419; *Philadelphia & S. S. Co. v. Pennsylvania,* 122 U. S. 326, 7 Sup. Ct. 1118; *Galveston, H. & S. A. R. Co. v. Texas,* 210 U. S. 218, 28 Sup. Ct. 638; *Pollock v. Farmers' L. & T. Co.* 157 U. S. 429, 15 Sup. Ct. 673; *Pollock v. Farmers' L. & T. Co.* 158 U. S. 601, 618, 15 Sup. Ct. 912. But shares of stock in Wisconsin railway companies which pay taxes on their property under ch. 315, Laws of 1903, are exempt from further taxation when owned or held by individuals of the state. Being exempt in the hands of residents of the state, they are likewise exempt in the hands of nonresidents. If a tax on the dividends or profits derived from such shares of stock is a tax on the property of the company which such shares represent, the tax is invalid. Sec. 25, ch. 315, Laws of 1903. If the tax on the dividends is neither a tax on the shares of stock nor on the property of the company which the shares represent, but is a tax on the dividends, separate and apart from both the shares of stock and the property, then such dividends as are received by nonresidents are not taxable under the act.

In a brief by *Lines, Spooner, Ellis & Quarles,* as *amici curiæ,* they contended (1) the income tax act is void because it discriminates against residents and in favor of nonresidents, contrary to art. IV and amendm. XIV, Const. of U. S.; (2) said act is void because it remits the income tax to the extent of taxes paid upon personal property, thus creating an unlawful discrimination in favor of persons owning personal property as against those owning none.

A brief filed by *Oscar M. Fritz,* as *amicus curiæ,* was devoted to the proposition that the income tax act is invalid because under subd. 2, 3, sec. 1087m—22, the tax is imposed by a different rule, and is rendered unequal in its operation, upon income of the same kind, in the same situation, and used for the same purpose. These provisions unquestionably subject the income of a resident to a higher rate of taxation than the income of a nonresident of the same character, although the income of each is equal in amount and is derived from the same source, under the same circumstances. Sec. 1, art. I, Const.; sec. 1, amendm. XIV, Const. of U. S.; *State v. Whitcom,* 122 Wis. 110, 118, 99 N. W. 468; *Black v. State,* 113 Wis. 205, 219, 89 N. W. 522; *W. C. Peacock & Co. v. Pratt,* 121 Fed. 772, 776; *Pollock v. Farmers' L. & T. Co.* 157 U. S. 429, 599, 600, 15 Sup. Ct. 673.

The following opinions were filed January 9, 1912:

WINSLOW, C. J.    These are actions in equity, brought for the purpose of enjoining the secretary of state and other state officers, including the tax commission, from paying out any state moneys, or doing any other administrative acts in the enforcement of the newly passed income tax law of this state, known as ch. 658, Laws of 1911, on the ground that said act is unconstitutional.

The *Bolens* action is an action sought to be brought within the original jurisdiction of this court, after refusal by the attorney general to bring it. This court, upon application

for leave to bring the action upon the relation of *Bolens* (a taxpayer), granted such leave, but expressly provided in the order that the question whether such action was an action properly within the original jurisdiction of this court should be reserved and argued with the demurrer upon the merits.

The *Winding* case is an action originally brought in the circuit court for Dane county by various persons and corporations who claim that they will be injuriously affected in various different ways by the provisions of the law. A demurrer on the three grounds of want of jurisdiction, want of legal capacity to sue, and insufficiency of facts having been sustained by the circuit court, the plaintiffs appeal to this court; and all the cases were argued together, briefs being also filed by several members of the bar as *amici curiæ*.

The law which is attacked in these actions adds thirty sections to the statutes, and also makes very substantial changes by amendment and repeal in secs. 1036 and 1038 of the existing statutes relating to the taxation of personal property. The first section of the law is numbered 1087m—1, and provides generally for the taxation of all incomes received during the year 1911, and annually thereafter.

Sec. 1087m—2 provides (1) that the term "person," as used in the act, shall include "any individual, firm, copartnership, and every corporation, joint-stock company or association organized for profit, and having a capital stock represented by shares," unless otherwise stated; (2) that the term "income" shall include:

a. All rent of real estate, including estimated rental of residence property occupied by the owner,

b. Interest on loans or evidences of debt of any kind,

c. Wages, salaries, or fees derived from services; *provided* that salaries of public officers are not to be included in those cases where the taxation thereof would be repugnant to the constitution,

d. All dividends or profits from stock or from the purchase

and sale of any property acquired within three years pre-
viously, or from any business whatever,

e. Royalties derived from the possession or use of fran-
chises or legalized privileges of any kind,

f. All other income from any source, except such as is ex-
empted by the act;

(3) that "the tax shall be assessed, levied and collected
upon all income, not hereinafter exempted, received by every
person residing within the state, and by every nonresident of
the state upon such income as is derived from sources within
the state or within its jurisdiction.   So much of the income
of any person residing within the state as is derived from
rentals, stocks, bonds, securities or evidences of indebtedness
shall be assessed and taxed, whether such income is derived
from sources within or without the state; provided that any
person engaged in business within and without the state shall,
with respect to income other than that derived from rentals,
stocks, bonds, securities or evidences of indebtedness, be taxed
only upon that proportion of such income as is derived from
business transacted and property located within the state,
which shall be determined in the manner specified in subdi-
vision (e) of section 1770b, as far as applicable."

Sec. 1087m—3 provides in substance for the following de-
ductions by corporations and joint-stock companies:

a. Sums paid within the year for personal services of all
officers and employees actually employed in the production of
the income;

b. Other ordinary and necessary expenses paid within the
year in the maintenance and operation of its business and
property, including reasonable depreciation of the property
from which the income is derived.   All bonds issued by a cor-
poration shall be deemed an interest in the property and busi-
ness of the corporation, and so much of the interest on the
bonds as is represented by the ratio of the total property lo-
cated and business transacted in the state to the whole prop-
erty and business of the corporation as provided in subd. 3

of 1087m—2 shall be subject to taxation at the same rate as the income and shall be assessed to the bondholders under the general designation of "the bondholders of" the particular corporation on the property of the corporation prior to other liens, and unless paid by the bondholders shall be enforced against the corporation, which may deduct the amount of the tax from the next interest payment on the bond.

c. Losses sustained during the year not compensated for by insurance or otherwise.

d. Sums paid within the year for taxes imposed by any other state upon the source from which the income taxed by this act is derived.

e. Dividends or income received during the year from stocks or interest in any firm, corporation, or joint-stock company, the income of which has been assessed under this act.

f. Interest received from bonds or securities exempt from taxation under United States laws.

By sec. 1087m—4 it is provided in substance that persons other than corporations and joint-stock companies shall be allowed the following deductions:

a. Ordinary and necessary expenses actually paid in carrying on the business from which the income is derived, including a reasonable allowance for depreciation in the property from which the income is derived.

b. Losses during the year not compensated by insurance or otherwise.

c. Dividends or incomes from stocks or interest in any firm or corporation, the income of which has been assessed under this act.

d. Interest paid during the year on existing indebtedness.

e. Interest on bonds or securities exempt under United States laws.

f. Salaries received from the United States by United States officials.

g. Pensions received from the United States.

h. Taxes (other than inheritance taxes) paid during the year on the property or business from which the income is derived.

i. Devises, bequests, or inheritances received during the year upon which an inheritance tax has been paid.

j. Life insurance to the amount of $10,000 received by persons legally dependent on the decedent.

Sec. 1087m—5 provides in substance for the following exemptions:

(1) a. To an individual, $800.

b. To husband and wife, $1,200.

c. For each child under eighteen years, $200.

d. For each additional person legally and wholly dependent on the taxpayer for support, $200.

e. These exemptions do not apply to nonresidents, nor to firms, corporations, or joint-stock companies. In computing such exemptions and the amounts of taxes payable under sec. 1087m—7, the income of a wife living with her husband shall be added to the husband's, and the income of each child living with its parent or parents shall be added to the parents' income.

(2) Income of mutual, savings, or loan and building associations, and of any religious, scientific, educational, benevolent, or other association not organized or conducted for pecuniary profit.

(3) Income from property and privileges by persons now required to pay taxes or license fees into the state treasury in lieu of taxes. Such persons shall continue to pay taxes and license fees as heretofore.

(4) Income received by the United States, the state, and all counties, cities, villages, school districts, or other political units of the state.

Sec. 1087m—6 provides in substance that the tax, after

making such deductions and exemptions, shall be computed at the following rates:

(1) a. On first thousand dollars or part thereof, 1 %
    b. " second " " " " " 1¼ %
    c. " third " " " " " 1½ %
    d. " fourth " " " " " 1¾ %
    e. " fifth " " " " " 2 %
    f. " sixth " " " " " 2½ %
    g. " seventh " " " " " 3 %
    h. " eighth " " " " " 3½ %
    i. " ninth " " " " " 4 %
    j. " tenth " " " " " 4½ %
    k. " eleventh " " " " " 5 %
    l. " twelfth " " " " " 5½ %
    On any sum exceeding $12,000, 6 %

(2) *Provided* that the tax on corporations and joint-stock companies (after deductions) shall be computed as follows:

a. If the income equals 1 per cent. or less of assessed value of property used in acquiring the income, the rate shall be ½ of 1 per cent. of such income;

b. If the income equals more than 1, but not more than 3 per cent. of such value, 1 per cent. of the income;

c. If more than 2, but not more than 3 per cent., 1½ per cent. of the income;

d. If more than 3, but not more than 4 per cent., 2 per cent. of the income;

e. If more than 4, but not more than 5 per cent., 2½ per cent. of the income.

f. If more than 5, but not more than 6 per cent., 3 per cent. of the income;

g. In like manner, the tax shall increase at the rate of one half of one per cent. for each additional one per cent. or fraction thereof which the taxable income bears to the property employed in the acquisition of the income, until the rate of

profits equals twelve per cent. of property employed in the acquisition of the income, when such rate shall continue as a proportional rate of six per cent. of such taxable income.

Sec. 1087m—7 provides as follows:

"The legislature intends subsection 2, of section 1087m—6 of this act, to be a separable part thereof, so that said subsection may fail or be declared invalid without adversely affecting any other part of the act; provided that in event of its failing or being declared invalid the incomes of corporations, joint-stock companies and associations shall be subject and shall be construed to have been subject to taxation at the rates specified in subsection 1, of section 1087m—6, and said incomes shall be reassessed by the tax commission and taxed for the years for which the rates provided in subsection 2, of section 1087m—6, shall have failed."

The next fourteen sections of the act are administrative purely. By their terms the enforcement of the act is placed in the hands of the state tax commission, which is authorized and required to divide the state into taxing districts and appoint an assessor of incomes in each district. The manner in which incomes are to be assessed and the taxes are to be collected is fully provided for, but it is not necessary to insert the provisions here, as no question is raised upon the details of these provisions.

Sec. 1087m—22 provides in substance that the place at which the income tax shall be assessed, levied, and collected shall be determined as follows:

(1) Persons deriving income from within and without the state, or from two or more political subdivisions of the state, shall report the parts so separately derived in separate accounts, in such form as the tax commission may prescribe.

(2) The entire taxable income of a resident of the state shall be combined for purpose of determining exemptions and rate of tax, but the taxes shall be paid to the several towns, cities, and villages in proportion to the income derived from

each, counting the income derived from without the state as derived from the town or city of the taxpayer's residence.

(3) The income of nonresidents derived from sources within the state shall be separately assessed and taxed in the town, city, or village from which it is derived.

(4) All laws not in conflict with this act, regulating time, place, and manner of collecting unpaid personal property taxes, shall apply to the income tax.

Sec. 1087m—23 provides that the revenue derived from the income tax shall be divided ten per cent. to the state, twenty per cent. to the county, and seventy per cent. to the town, city, or village in which it is assessed, levied, and collected.

Sec. 1087m—25 abolishes the office of county supervisor of assessment on and after the first Monday in January, 1912, and provides that the county supervisor of incomes shall after that date perform all the duties imposed by law upon the county supervisor of assessment.

Sec. 1087m—26 provides that any person paying a tax on personal property during any year may present his receipt therefor, and have the same accepted by the tax collector to its full amount in payment of income tax during said year; and that any bank paying taxes upon the shares of its individual stockholders may present the receipt therefor, and have the same accepted in payment of taxes upon the income of the bank during that year.

Sec. 1087m—27 provides that nothing in the act shall affect in any way the taxes for the year 1911 or the collection or enforcement thereof.

By the amendment to sec. 1036 of the Statutes of 1898, there is taken out of the items of personal property subject to taxation "all debts due from solvent debtors, whether on account, note, contract, bond, mortgage or other security, or whether such debts are due or to become due," also "moneys;"

and by the amendment to subd. 10 of sec. 1038, Stats. (1898), the following property is made exempt from taxation: "all moneys, all debts due or to become due to any person, and all stocks and bonds not otherwise specially provided for."

By the concluding sections of the act certain other changes are made in exemptions from taxation, which have the effect of somewhat enlarging such exemptions, especially in the line of personal ornaments and belongings and agricultural implements, but the details of these changes are not necessary to be stated.

At the inception of the *Bolens* case the question of jurisdiction is sharply raised; and it is very strongly argued, especially in a brief filed by Gen. F. C. Winkler, that this is not a case properly within the original jurisdiction of this court, as that jurisdiction has been defined and limited by the cases commencing with the *Railroad Cases* (*Att'y Gen. v. Railroad Cos.* 35 Wis. 425).

The argument, in brief, is that the action is nothing more nor less than a taxpayer's action; that such actions may properly be entertained in the case of illegal expenditures by cities, counties, villages, or other municipalities, but cannot properly be brought against state officers, because, in effect, they are actions against the state, and the state cannot be sued without its consent.

This objection might perhaps be summarily disposed of by a brief reference to the case of *State ex rel. Raymer v. Cunningham*, 82 Wis. 39, 51 N. W. 1133, where a case of similar character, brought on the relation of a taxpayer, was entertained and decided upon the merits against objection to the jurisdiction, and by further reference to the cases of *State ex rel. Garrett v. Froehlich*, 118 Wis. 129 (at page 143), 94 N. W. 50; *State ex rel. Rosenhein v. Frear*, 138 Wis. 173, 119 N. W. 894; and *In re Filer & S. Co.* 146 Wis. 629, 132 N. W. 584, in each of which cases the right to maintain similar actions in this court is either impliedly or expressly asserted.

We do not feel, however, that we ought to dispose of this very important question without thoroughly examining it, for several quite persuasive reasons.    Reference to the cases just cited will show that the question never has been discussed in any opinion.    In the *Raymer Case,* which is the first of the series and which was a case brought on the relation of a taxpayer to enjoin the payment of money to the state superintendent of public instruction, under a law which violated an express constitutional prohibition, it was said in substance that it was held in the case of *State ex rel. Att'y Gen. v. Cunningham,* 81 Wis. 440, 51 N. W. 724, that such an action was within the original jurisdiction of this court and would be entertained.    It is very clear that the *Cunningham Case* was not such a case, and involved very different considerations. The *Cunningham Case* was an action brought on the relation of the attorney general to enjoin the secretary of state from giving election notices under an apportionment law which was held to deprive a very large number of the voters of the state of political rights guaranteed to them by the constitution.    This was held to be an invasion of the liberties of the people, and hence the case came clearly within the original jurisdiction of this court as laid down in the *Railroad Cases.* No question of the wrongful expenditure of state funds, nor of a taxpayer's right to invoke the original jurisdiction of this court to prevent such expenditure, was involved or mentioned in the case.

No discussion of the question appears in the other cases cited, so it seems clear that the court has not yet taken up and considered the question as an original one.

It has been spoken of as a very important question, and advisedly so spoken of.    Laws which are framed to meet and correct some existing situation deemed by the legislature to be undesirable will generally, or at least frequently, involve the expenditure of some money in their enforcement.    If, whenever such a law is passed, it is within the power of any tax-

payer, however paltry his contribution to the public funds, to come into this court and invoke its original jurisdiction and compel it to pass upon the validity of the law, it is not difficult to forecast the result.    Every important law will be adverse to the interests of some taxpayers, and with such a principle established this court stands in great danger of becoming to all intents and purposes a third chamber of the legislature, not named in the constitution, but exercising a veto power over the other houses when invoked by any taxpayer.    The power to pass upon the constitutionality of laws when the question arises in the course of ordinary litigation is a great power, one to be exercised with the greatest possible caution and wisdom; but the power to take up and pass upon a law involving the expenditure of any state funds as soon as it is passed, at the suggestion of any taxpayer, and place a judicial veto upon its execution, is a still greater one.    No higher power than this can well be conceived in a government such as ours; certainly no power will demand greater wisdom in its exercise, if it exists.    This court has unquestionably taken the position in a number of well considered cases that the courts can and will restrain public officers from enforcing an unconstitutional law which invades private or public rights.    *State ex rel. Att'y Gen. v. Cunningham,* 81 Wis. 440, 51 N. W. 724; *State ex rel. Lamb v. Cunningham,* 83 Wis. 90, 53 N. W. 35 ; *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W. 885 ; *Wadhams Oil Co. v. Tracy,* 141 Wis. 150, 123 N. W. 785.    But this court has clearly recognized that this power is a delicate one, and to be used only with a wise discretion.    It was said in the last case cited that "it will not do to make of the courts, by equitable interference, a sort of a superior upper house to consider and pass, in general and particular as well, upon legislative enactments."

Concerning this power Judge Dodge very rightly observes in his brief in the present case:

"No higher power can be conceived than that of the judiciary to stay the action of the co-ordinate executive or legisla-

ture from an act or policy which the latter conscientiously believe to be constitutional and for public welfare. As the power is transcendent its exercise must be with caution and moderation; albeit with courage. The frequency of the attempts by individuals to invoke this power of veto invites the anxious consideration of the wisdom and propriety of its exercise in each case."

The question now before us is whether this court has consciously and advisedly held that it is sufficient to call for the exercise of this extreme power that a taxpayer come into court and demand that the public treasury be protected from the expenditure of funds under a law concerning whose constitutionality there may be doubt.

The consideration of this question has prompted us to make a re-examination of the entire question of the original jurisdiction of this court, and to make an attempt to classify the significant decisions upon the subject, in the hope that thereby the scope and purpose of that jurisdiction, as the court has endeavored to define and limit it, may be better understood. The results of this re-examination are now to be stated as briefly as may be.

The constitutional grant of jurisdiction to the supreme court (sec. 3, art. VII, Const.), after providing that it shall have appellate jurisdiction co-extensive with the state, provides that it "shall have a general superintending control over all inferior courts; it shall have power to issue writs of *habeas corpus, mandamus,* injunction, *quo warranto, certiorari,* and other original and remedial writs, and to hear and determine the same."

Since the decision of the *Railroad Cases,* 35 Wis. 425, it has been very well understood that by this section of the constitution three distinct and independent grants of power or jurisdiction were made to this court, viz.: (1) the appellate power; (2) the power of superintending control over inferior courts; and (3) the original jurisdiction to be exercised by means of the writs named in the section. We are only concerned here with the grant of original jurisdiction.

It will be at once noticed that this grant is practically un-
limited in extent, except as it may be said to be limited by
the scope of the writs named, and it is for this reason probably
that (with the exception of *Att'y Gen. v. Blossom*, 1 Wis. 317,
to be referred to later) practically no attempt was made, prior
to the decision in the *Railroad Cases*, to discuss the purpose or
limits of the original jurisdiction. It was very frequently
exercised, but plainly with no clear or logical idea of the pur-
poses for which it was given to the court, unless possibly it
may be said that there was the idea that the wrong to be re-
dressed or prevented must be a wrong affecting the public, or
some part of the public of a given locality or class, as dis-
tinguished from a wrong affecting individuals only.

*Habeas corpus* was so frequently used that the citation of
the cases would be mere surplusage. *Mandamus* to compel
official action by local or municipal officers was also very fre-
quent. Thus the court entertained and decided upon the
merits actions of *mandamus* to compel town assessors to re-
duce an assessment of personal property, *State ex rel. Ward
v. Assessors*, 1 Wis. 345; to compel a circuit judge to hold
court in a new county, *State ex rel. Powers v. Larrabee*, 1
Wis. 200; to compel county supervisors to strike property
from the assessment roll, *State ex rel. Beebe v. La Fayette
Co.* 3 Wis. 816; to compel highway commissioners to act,
*State ex rel. Doxtador v. Bailey*, 6 Wis. 291; to compel a
school district clerk to make an official report to the town
clerk, *State ex rel. School Dist. v. Eaton*, 11 Wis. 29; to com-
pel county officers to locate their offices at a certain place as
a means of testing the validity of county-seat elections, *Att'y
Gen. ex rel. Turner v. Fitzpatrick*, 2 Wis. 542; *State ex rel.
Cothren v. Lean*, 9 Wis. 279; *State ex rel. Spaulding v. Ell-
wood*, 11 Wis. 17; *State ex rel. Field v. Saxton*, 11 Wis. 27;
*State ex rel. Gates v. Fetter*, 12 Wis. 566; to compel town su-
pervisors to audit damages allowed in laying out a highway,
*State ex rel. Van Vliet v. Wilson*, 17 Wis. 687; to compel a

city council to levy and collect a tax to pay a judgment or pay the expense of work done for the city, *State ex rel. Soutter v. Madison,* 15 Wis. 30; *State ex rel. Christopher v. Portage,* 12 Wis. 562; *S. C.* 14 Wis. 550; *State ex rel. Carpenter v. Beloit,* 20 Wis. 79; *State ex rel. Hasbrouck v. Milwaukee,* 25 ·Wis. 122; to compel a county board to admit one duly elected as a member to sit and act as such, *State ex rel. Gill v. Milwaukee Co.* 21 Wis. 443; to compel the mayor of a city to appoint certain officers, *State ex rel. Att'y Gen. v. O'Neill,* 24 Wis. 149; to compel a city treasurer to deliver certain books to the county clerk, *State ex rel. Saar v. Hundhausen,* 26 Wis. 432; to compel the transfer of prisoners from the Milwaukee jail to the house of correction, *State ex rel. Kennedy v. Brunst,* 26 Wis. ·412; to compel county supervisors to erect county buildings, *State ex rel. Park v. Portage Co.* 24 Wis. 49; to compel county supervisors to provide certain officials with office rooms, *State ex rel. Keenan v. Milwaukee Co.* 25 Wis. 339; to compel the Milwaukee chamber of commerce to restore a member to his rights and franchises as a member, *State ex rel. Graham v. Chamber of Comm.* 20 Wis. 63; and doubtless other cases may be found.

It should be noted in this connection that in one case (*State ex rel. Board of Ed. v. Haben,* 22 Wis. 101) the court declined to entertain an action of *mandamus* against the treasurer of a city to compel him to pay over the school moneys in his hands to the school board, giving as a reason that the remedy in the circuit court was ample. Judge COLE there states that the practice of applying to the supreme court for writs of *mandamus* against local officers was becoming very common, and that in view of the increasing duties of the court, and in pursuance of a rule of court then recently adopted, it would be held in the future that "Wherever there is anything in the application which shows that it would be unavailing if made at the proper circuit, or where, from the nature of the questions involved, it would seem necessary and proper that

the suit be commenced in the supreme court, jurisdiction will be entertained.    Otherwise it will not be, but parties will be required to make their application to the circuit court." This rule seems, however, to have been more honored in the breach than in the observance, as the cases just cited, which came up after the *Haben Case,* abundantly testify.

*Quo warranto* cases to try the title to public office, from that of governor down to school director, were very frequent. Thus the writ was used to try the title to the office of governor in *Att'y Gen. ex rel. Bashford v. Barstow,* 4 Wis. 567; of district attorney in *Att'y Gen. ex rel. Carpenter v. Ely,* 4 Wis. 420; of treasurer of a city in *State ex rel. Tesch v. Von Baumbach,* 12 Wis. 310; of school director in *State ex rel. Law v. Perkins,* 13 Wis. 411; of circuit judge in *State ex rel. Att'y Gen. v. Messmore,* 14 Wis. 115; of sheriff in *State ex rel. Peacock v. Orvis,* 20 Wis. 235; of justice of the peace in *State ex rel. Holden v. Tierney,* 23 Wis. 430; of supervisor in *State ex rel. Peck v. Riordan,* 24 Wis. 484; of superintendent of the poor in *State ex rel. Grundt v. Abert,* 32 Wis. 403; of treasurer of an incorporated church benevolent association in *State ex rel. Att'y Gen. v. Conklin,* 34 Wis. 21; and there are numerous similar cases.    As tending to explain the large number of these cases involving only small local offices, it should be noticed that by ch. 23, Laws of 1855, any person claiming to be entitled to hold "any public office" usurped by another was given the right to file in the supreme court an information in the nature of a *quo warranto,* with or without the consent of the attorney general.    While the code of pleading and practice which was passed the following year (ch. 120, Laws of 1856) entirely revised the practice in such cases, and contains no such sweeping provision, still resort seems to have been had to the supreme court in practically all cases of disputed title to office until the decision in the *Railroad Cases.*

*Quo warranto* to forfeit corporate charters for abuse or nonuse of franchises was also brought in *State v. Milwaukee G.*

*L. Co.* 29 Wis. 454, and in *State v. West Wis. R. Co.* 34 Wis. 197.

The foregoing citations by no means cover all of the cases in which the original jurisdiction was used prior to the *Railroad Cases,* but it is believed that they cover all that are of any significance, except the *Blossom Case* (which is to be soon considered), and it is also believed that they conclusively demonstrate that there was in the judicial mind during that period no serious thought that the original jurisdiction given to this court was intended to be or ought to be limited by excluding any particular class of cases therefrom, except probably cases involving mere individual wrongs, with which the public was in no manner concerned.

Relating to this subject, Judge Dixon might well say, as he did in his brief in the case of *Att'y Gen. v. Eau Claire,* 37 Wis. 400, at page 411, "It is not surprising that the court looked in vain to the bar for assistance in the argument of the *Railway Cases* when we reflect that both court and bar had been wandering in utter darkness for a period of more than twenty-five years." It is very evident that Judge Dixon knew whereof he spoke when he wrote these words. During fifteen years of the twenty-five he had been the leader of the wanderers.

It is quite plain, we think, that however valuable the cases which we have thus briefly reviewed may be as authorities on the general propositions of law involved in them (and many of them are very valuable in this respect), they have absolutely no value on the question of the extent of the original jurisdiction of the court, for that question was never discussed or considered in any of them, and they have been gathered together here for the simple purpose of demonstrating their worthlessness as precedents upon that question, and to prevent either bench or bar from placing reliance upon them so far as that question is concerned in the future.

The case of *Att'y Gen. v. Blossom,* 1 Wis. 317, has not been

included in the foregoing list because in that case, which was
the first case where the original jurisdiction was challenged,
there was an illuminating discussion in the opinion of Justice
SMITH, not only of the existence of any original jurisdiction
in this court, but also of the purposes which were intended to
be accomplished by the exercise of that jurisdiction.    After
meeting the contention that the court had only appellate juris-
diction, and demonstrating that the armory of common-law
writs with which the constitution endowed the court in the
last clause of the section quoted were original in their func-
tions and necessarily implied the exercise of original jurisdic-
tion, he used these pregnant words, remarkable in their
strength and wisdom now, and vastly more remarkable when
it is reflected that they were written nearly sixty years ago:

"And, why was original jurisdiction given to the supreme
court, of these high prerogative writs?    Because these are the
very armor of sovereignty.    Because they are designed for
the very purpose of protecting the sovereignty and its or-
dained officers from invasion or intrusion, and also to nerve
its arm to protect its citizens in their liberties, and to guard
its prerogatives and franchises against usurpation.    The con-
vention might well apprehend that it would never do to dissi-
pate and scatter these elements of the state sovereignty among
five, ten, twenty, or forty inferior tribunals, and wait their
tardy progress through them to the supreme tribunal, upon
whose decision must finally depend their efficacy.    To pre-
serve the liberties of the people, and to secure the rights of
its citizens, the state must have the means of protecting it-
self."

Here was clearly expressed the great idea that the original
jurisdiction was given to this court in order that the state
might use it to protect itself and its sovereignty and the lib-
erties of the people at large.

Strange indeed it seems that this idea so forcibly expressed
in 1853 should have been completely ignored and forgotten
for more than twenty years thereafter, notwithstanding the
fact that applications for the exercise of that jurisdiction

were increasing in number year by year. ' When, however, in 1874, the state, through its chief law officer, essayed to use the original jurisdiction for the purpose of curbing the great railroad companies of the state and compelling them to obey an act fixing rates of carriage for freight and passengers, the question of the extent of the jurisdiction was again sharply brought to the mind of the court, and it was philosophically discussed by Chief Justice RYAN in words which have ever since that time been regarded as authoritatively determining the attitude of this court upon the question. They have been often quoted and applied since that time and are very familiar. In brief, the principle there decided was that, in order to put in motion the original jurisdiction of this court, the question must not only be *publici juris, i. e.* a question of public right, but it must be a question "affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people." *Att'y Gen. v. Railroad Cos.* 35 Wis. 425.

In the case of *Att'y Gen. v. Eau Claire,* 37 Wis. 400, immediately following the *Railroad Cases,* where the attorney general invoked the original jurisdiction to restrain the alleged illegal obstruction of a navigable river flowing into the Mississippi, the same doctrine was announced and somewhat elaborated upon, especially with regard to the term *publici juris.* In this opinion it was said:

"Of course every question of municipal taxation is *publici juris.* But it is equally so whether it be raised by a taxpayer, or by the municipality, or by the state. It is not enough to put in motion the original jurisdiction of this court that the question is *publici juris;* it should be a question *quod ad statum reipublicæ pertinet.* . . .

"And though the question did not arise in this case, it is quite evident from all that has any bearing on it in *Att'y Gen. v. Railroad Cos.,* that to bring a case properly within the original jurisdiction of this court, it should involve, in some way, the general interest of the state at large. It is very true that the whole state has an interest in the good administration

of every municipality; so it has in the well doing of every citizen.   Cases may arise, to apply the words of C. J. Stow, geographically local, politically not local; local in conditions, but directly affecting the state at large.   Cases may occur in which the good government of a public corporation, or the proper exercise of the franchise of a private corporation, or the security of an individual, may concern the prerogative of the state.   The state lends the aid of its prerogative writs to public and private corporations and to citizens in all proper cases.   But it would be straining and distorting the notion of prerogative jurisdiction to apply it to every case of personal, corporate or local right, where a prerogative writ happens to afford an appropriate remedy.   To warrant the assertion' of original jurisdiction here, the interest of the state should be primary and proximate, not indirect or remote; peculiar perhaps to some subdivision of the state, but affecting the state at large, in some of its prerogatives; raising a contingency requiring the interposition of this court to preserve the prerogatives and franchises of the state, in its sovereign character; this court judging of the contingency, in each case, for itself.   For all else, though raising questions *publici juris,* ordinary remedies and ordinary jurisdictions are adequate.   And only when, for some peculiar cause, these are inadequate, will the original jurisdiction of this court be exercised for protection of merely private or merely local rights. . . .

"It was suggested that we should establish general rules governing our original jurisdiction.   That would be too bold an undertaking to venture on.   Rules will arise, as cases come here, far more safely and properly than they could be prescribed in advance.   We can now only declare the views which influence us in passing upon this motion.   It is sufficient here to hold that proceedings to restrain municipal undertakings or municipal taxation, in ordinary cases, belong appropriately to the original jurisdiction of the circuit, and not of this court.

"These are questions *publici juris,* as are title to local public office, performance of local official duty, use of local highways, maintenance of local public buildings, abuse of local power or franchise, and kindred local matters.   But these are not generally questions directly involving the sovereign prerogative or the interest of the state at large, so as to call

for the prerogative jurisdiction of this court.  As a rule, no extraordinary jurisdiction is necessary or proper for them; the ordinary jurisdiction of the circuit court being ample. Practically it would be impossible to take jurisdiction of them all here; and we intend to assume jurisdiction of none of them, which are not taken out of the rule by some exceptional cause.  When they are governed by some peculiarity which brings them within the spirit and object of the original jurisdiction of this court, we will entertain them.  Otherwise they will be left to the circuit courts.  And this we understand to be the true spirit and order of the constitutional grant of jurisdiction."

In this case also was laid down the general principle that, while jurisdiction would never be assumed to enforce a mere private right, still jurisdiction would not be refused because there might be a private relator in the case who possessed a private interest bound up with the public interest, if in fact there was the necessary public interest before defined; and that the court in rendering judgment in such a case would not ignore the private interest of the relator, but administer full relief; but, on the other hand, if the private right of a relator and the public right of the state met in the same litigation, the private right of the relator might entirely disappear, and the relator drop out, but the court would still proceed and vindicate the public right, if there be a public right separable and distinct from the private right.  This doctrine was more fully elaborated and stated in *State ex rel. Drake v. Doyle,* 40 Wis. 175, which will be referred to later in this opinion.

The *Railroad Cases* and the *Eau Claire Case,* taken together, harmoniously following and more fully developing the great idea first announced in general terms by Judge SMITH in the *Blossom Case,* may be truly said to have established the fundamental reason for the existence of the original jurisdiction of this court, and the limits within which, in view of that reason, the court would endeavor to confine its exercise. No attempt was made in either case to mark out or define in advance the particular questions or kinds of questions which

would be considered as affecting the "sovereignty of the state, its franchises or prerogatives, or the liberties of its people." Such an attempt would manifestly have been as unwise as it would have been futile; human prescience is not equal to such a task. So the court wisely contented itself with announcing the general principle, leaving itself free to judge in each case whether the contingency which justified and required the use of the jurisdiction had arisen. Since the decision of those cases this court has faithfully endeavored to follow the general rules laid down in them. Numerous applications for the exercise of the original jurisdiction have been made, and of these many have been granted and some have been refused. The question of the application of the general rules aforesaid has arisen and been discussed and decided in a number of cases presenting widely different problems. Sufficient time has now elapsed so that it should be possible to draw from these decisions some general conclusions as to the limits of the jurisdiction as the court has administered it. If this can be done it certainly ought to be helpful in the future administration of the jurisdiction, not because it will or can put up the bars so that no future case can be brought within the jurisdiction unless it has its prototype in the past, but because every discussion and ruling upon the question as a new case is presented should be helpful in developing some philosophical and orderly rules for the application of the general abstract principles laid down in the two cases last named to concrete cases as they arise in the future.

With this idea in mind a brief review of the significant cases decided since the decisions in the *Railroad Cases* will now be undertaken, and an attempt will be made to classify them.

1. The most numerous cases probably are the *habeas corpus* cases, and they may well be first disposed of. The first of these cases where the question of the jurisdiction was discussed was the *Pierce Case* (*In re Pierce*, 44 Wis. 411),

where, in spite of the vigorous protest of Chief Justice RYAN, it was held that the state had so vital an interest in the liberty of every one of its citizens that the question whether a citizen was unlawfully deprived of that liberty involved the interest of the public at large. The reasoning by which the unlawful imprisonment of a single citizen is held to involve the interests of the public at large, so as to justify the use of the original jurisdiction of the supreme court, may seem somewhat strained, but the decision has been followed without question in numerous cases since that time, and furthermore it is to be noticed that the legislation of the state from the earliest days of the state had provided for the issuance of the writ by any justice of the supreme court, and by ch. 45 of the Laws of 1864 had further provided that all applications for the writ on behalf of a person confined in the state prison must be made to the supreme court or one of the justices thereof. This latter provision has remained upon the statute book ever since (sec. 3409, Stats. 1898), and this court has held that it applies to applications made by persons confined upon conviction for felony in the Milwaukee house of correction as well. *State ex rel. Heiden v. Ryan,* 99 Wis. 123, 74 N. W. 544. It does not seem necessary or useful to cite the numerous *habeas corpus* cases which have been entertained by this court since the *Pierce Case.*

2. Next may be considered the *quo warranto* cases, and of these we have found but five cases which seem of any significance, namely: *State ex rel. Wood v. Baker,* 38 Wis. 71; *Att'y Gen. v. West Wis. R. Co.* 36 Wis. 466; *State ex rel. Att'y Gen. v. M., L. S. & W. R. Co.* 45 Wis. 579; *State ex rel. Radl v. Shaughnessey,* 86 Wis. 646, 57 N. W. 1105; and *In re Holland,* 107 Wis. 178, 83 N. W. 319.

The first of these cases was brought to try the title to the office of county clerk, and it was held that contests concerning the title to county offices were not within the jurisdiction marked out for itself by the court in the *Railroad Cases,* but

that because the title of the judge of the circuit court to the office of Congressman depended on the same votes which were questioned in the case, and hence he could not with propriety sit, the case came within the exception suggested in the *Eau Claire Case,* namely, cases where the ordinary jurisdiction of the circuit is entirely inadequate. The evident meaning of this case is that contests over local offices will not be entertained unless the situation be such that the remedies in local courts are absolutely inadequate. It may well be doubted whether such a case as the *Wood Case* would now be entertained, in view of the ease with which under present laws another judge can be at once called in to try a case where the circuit judge is disqualified or declines to sit. The second and third cases named were actions brought to forfeit corporate charters granted by the state to railroad companies, because of breach of duty on the part of the companies. They unquestionably fall within the jurisdiction as defined in the *Railroad Cases,* for in such an action the state is suing to punish the abuse or misuse of *franchises* granted by it in its sovereign capacity. In this connection it is pertinent to note that the legislature, by secs. 3240 *et seq.* of the statutes (R. S. 1878 and Stats. 1898), has for many years provided for actions in the name of the state to vacate corporate charters, which may be brought either in the supreme or circuit court, as this court may direct. See *State ex rel. Lederer v. Inter-National Inv. Co.* 88 Wis. 512, 60 N. W. 796. In the *Shaughnessey Case* it was sought to use the original jurisdiction of this court to try the title to the office of justice of the peace, and jurisdiction was declined on the ground that it was a local matter purely, which did not affect the state at large. For the same reason jurisdiction was declined in the *Holland Case,* in which it was sought to test the validity of the incorporation of a village.

3. Next may well be classed the two great cases of *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, and *Att'y Gen. v. Eau*

*Claire,* 37 Wis. 400, in the first of which the state sued to prevent the great public-service corporations of the state from systematically violating and defying laws regulating their rates in the interest of the whole people, which laws were in effect amendments to the corporate charters of the companies; and in the second of which the state sued to prevent a pourpresture in one of the great navigable rivers of the state connecting with the Mississippi river, which the state is bound to keep open as a common highway to the people of this state and of the United States. Upon the same general ground this court later entertained an action on the relation of the attorney general to prevent the tearing up of a railroad, the idea being that a railroad operated under a franchise granted by the state is a state highway whose destruction affects the interests of the state at large. *State ex rel. Att'y Gen. v. Frost,* 113 Wis. 623, 88 N. W. 912, 89 N. W. 915. The great public interests involved in these cases are so apparent as to obviate the necessity of comment upon them. In the case of *State v. St. Croix B. Corp.* 60 Wis. 565, 19 N. W. 396, however, the court declined jurisdiction of a case very similar to the *Eau Claire Case,* because the St. Croix river was a river on the boundary of the state, as to which the state was under no trust to keep it open.

4. In the next class may be placed the cases where it has been sought by *mandamus* or mandatory injunction to compel a state officer to perform a ministerial duty. Under this head the cases involving performance of important duties imposed on state officers by the general election laws form a striking group, the first of these cases being the case of *State ex rel. McDill v. State Canvassers,* 36 Wis. 498, where *mandamus* was sought to compel the state board of canvassers to declare a certain result from the returns of a Congressional election, and the court deemed the case one wherein the original jurisdiction should be exercised, although the office in issue was in a sense local, because the circuit judge himself was the op-

posing candidate and could not act judicially upon such a question, hence the remedy in the circuit court was utterly inadequate: It is instructive to note that after this decision, by ch. 231 of the session laws of 1880, the legislature passed an act regulating the procedure in *mandamus* cases brought in the supreme court against *any* board of canvassers to compel the delivery of a certificate of election to either of the offices of member of the legislature, congressman, or presidential elector, thus apparently giving the legislative sanction to the idea that controversies concerning the canvass of votes at general elections for either of such offices so far affected the prerogatives of the state or the liberties of the people, or both, as to come fairly within the original jurisdiction of the court. The substance of this provision has ever since remained a part of the *mandamus* statute. Sec. 3452, Stats. (1898). Other cases where the original jurisdiction has been invoked to compel the performance of official duty imposed by general election laws are the cases of *State ex rel. Kustermann v. Board of State Canvassers,* 145 Wis. 294, 130 N. W. 489; *State ex rel. Cook v. Houser,* 122 Wis. 534, 100 N. W. 964; *State ex rel. Bancroft v. Frear,* 144 Wis. 79, 128 N. W. 1068; and *State ex rel. Rinder v. Goff,* 129 Wis. 668, 109 N. W. 628. The first of these last named actions was practically the same as the *McDill Case,* the second and third were cases involving the duty of the secretary of the state, under general election laws, to place the names of certain persons upon the official ballot as nominees of a great political party for state offices, and the *Rinder Case* was a very good example of the exceptional cases where, though the office in issue was purely local, jurisdiction was assumed because of the absolute inadequacy of the remedy in the lower courts, and the abstract question involved was a question affecting the interests of the entire public.

Another group of significant cases under the fourth head are the *mandamus* actions brought to compel payment of

funds from the state treasury to the persons or corporations alleged to be entitled thereto by law. In this group fall *State ex rel. Bell v. Harshaw,* 76 Wis. 230, 45 N. W. 308, brought to compel the state treasurer to pay over certain moneys in the state treasury to certain counties; *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 88 N. W. 596, 90 N. W. 1067, brought to compel the state treasurer to pay over to the city of New Richmond an appropriation made by the legislature on account of damages suffered by the city in a cyclone; *State ex rel. Garrett v. Froehlich,* 118 Wis. 129, 94 N. W. 50, brought to compel auditing of claims against the state for the Keeley treatment of drunkards at private sanitariums; *State ex rel. Buell v. Frear,* 146 Wis. 291, 131 N. W. 832, brought to compel auditing of salaries of the civil service commission and its employees; and *State ex rel. Bashford v. Frear,* 138 Wis. 536, 120 N. W. 216, brought to compel auditing of the salary of a justice of this court.

Under this head also naturally fall the cases involving the issuance or revocation of licenses and patents, and of these the case of *State ex rel. Drake v. Doyle,* 40 Wis. 175, is the most significant. Here *mandamus* was invoked against the secretary of state upon the mere relation of a private individual in order to compel that officer to revoke the license of a foreign insurance company because it had committed an act which, under the state law, worked a forfeiture of its license. In this case the attorney general appeared for the secretary of state, and suggested that the relator's personal grievance had been settled; nevertheless the action went on *as the suit of the state* to vindicate and preserve "the prerogatives of the state in its sovereign character" (page 186), and a peremptory *mandamus* was awarded.

Other cases of this general nature are *State ex rel. Anderson v. Timme,* 60 Wis. 344, 18 N. W. 837, brought to compel the issuance of a patent by the commissioners of public lands; *State ex rel. Abbot v. McFetridge,* 64 Wis. 130, 24 N. W.

140, to compel issuance of a license to a railroad company to do business, on the allegation that it had fully paid the legal license fees; also the case of *State ex rel. Covenant Mut. Ben. Asso. v. Root,* 83 Wis. 667, 54 N. W. 33, brought to compel the state insurance commissioner to issue a license to a foreign insurance company which had fully complied with the law. This last case, however, was directly overruled in the case of *In re Court of Honor,* 109 Wis. 625, 85 N. W. 497, where this court refused to entertain an exactly similar action, on the ground that the primary right sought to be vindicated was private, and the public right, if involved at all, was only incidentally affected, and hence the circuit court was the appropriate tribunal to pass on the question in the first instance. Whether this ruling does not in effect negative jurisdiction in the *Timme* and *McFetridge Cases* just cited may be a question of some doubt, but it is not necessary to determine it here. The case of *State ex rel. Guenther v. Miles,* 52 Wis. 488, 9 N. W. 403, where the original jurisdiction was used on the relation of the state treasurer to compel a county treasurer to make an official return, is not significant, as the question of jurisdiction was not raised.

5. In the last class fall the cases where it is sought to restrain a state officer (and in exceptional cases a county officer) from committing an unlawful act which will affect the prerogatives or sovereignty of the state or the liberties of the people. The most conspicuous examples in this class of cases are the so-called "Gerrymander cases" (*State rel. Att'y Gen. v. Cunningham,* 81 Wis. 440, 51 N. W. 724, and *State ex rel. Lamb v. Cunningham,* 83 Wis. 90, 53 N. W. 35), the first of which was brought by the attorney general himself, and the second by a private relator on leave of the court, after the attorney general had refused to act. In these cases it was sought to enjoin the secretary of state from carrying out the terms of an apportionment law, on the ground that the law violated the commands of the constitution and was void.

Here for the first time this court held that it could and would, on the relation of a private citizen, prevent a state officer from enforcing an unconstitutional law which injuriously affected the liberties of the people, as an unfair and unconstitutional division of the legislative election districts of the state must necessarily do. In neither of these cases was jurisdiction sustained because of the alleged unlawful expenditure of public funds, nor because of the fact that the relator was a taxpayer, but in both the ground was that an injury to the people of the state was about to be committed by depriving many voters of their just and constitutional rights in the election of the legislative bodies of the state under the form of a law which violated the express command of the constitution. The evident idea was that the relator was in no sense the plaintiff; he simply brought the matter to the attention of the court, and when he had performed this function he ceased to be of importance,—the suit became from its inception the suit of the state to vindicate the liberties of its people generally.

Following these cases at a considerable distance in time, but practically identical in principle, are the so-called "Twenty per cent." cases (State ex rel. McGrael v. Phelps, 144 Wis. 1, 128 N. W. 1041, and State ex rel. Hanna v. Frear, 144 Wis. 58, 128 N. W. 1061), where, on the relation of private individuals, state and county officers were sought to be enjoined from enforcing a law requiring that in order to be represented on the official ballot a political party must cast at the primary twenty per cent. of its vote for governor at the last preceding general election. The ground taken was that this provision was an unreasonable, unconstitutional restriction or infringement on the freedom of the ballot, and hence it affected the liberties of the people. Although objection to the jurisdiction was formally taken in these cases, it was not pressed, it was not discussed, and the court simply said that it saw no reason why jurisdiction should not be exercised.

In this class, if anywhere, must naturally fall the case of *State ex rel. Raymer v. Cunningham,* 82 Wis. 39, 51 N. W. 1133, which has been previously cited, brought on the relation of a taxpayer to prevent the payment of salary to a state officer over and above the amount limited by the constitution. As has been before said in this opinion, the jurisdiction in that case was sustained by brief reference to the first gerrymander case, which is quite plainly a different case. Unquestionably the real ground was that the legislature was by express command of the constitution prohibited from paying to the state superintendent out of the state funds any sum exceeding $1,200 per annum; hence the law attacked in that case, which directed payment of a greater sum every year, was absolutely void, and the state itself was entitled to the intervention of the extraordinary jurisdiction of this court to protect itself from unconstitutional and unlawful depletion of its treasury by its own officers.

In both the *Rosenhein Case* (*State ex rel. Rosenhein v. Frear,* 138 Wis. 173, 119 N. W. 894) and the *Filer & Stowell Co. Case,* 146 Wis. 629, 132 N. W. 584, the applications to bring actions on the relation of taxpayers were denied, because it was considered in each case that no unlawful expenditure of funds by state officers was threatened, but in the first named case it was expressly said, and in the second it was assumed, that in order to prevent illegitimate expenditure of state funds an equitable action on the initiative of a taxpayer, after refusal by the attorney general, would be properly within the original jurisdiction of this court.

There are several other cases which have more or less bearing on the general question which will be briefly mentioned. In the case of *In re Hartung,* 98 Wis. 140, 73 N. W. 988, it was sought to use the original jurisdiction of this court by way of injunction to put an end to a public nuisance in the town of Wauwatosa, consisting of the depositing of garbage on the surface of land to the discomfort of a very large neigh-

borhood, but it was held that such a wrong, though public, was
not a wrong affecting the sovereignty, franchises, or preroga-
tives of the state, or the liberties of the people at large, and
that the remedy was in the local courts.   This seems to be an
entirely logical application of the general principle laid down
in the *Railroad Cases,* that even though a question be *publici
juris* it will not call for the use of the original jurisdiction if
it be merely local in its effect.

The sequel to this case, which appears by reference to
*State ex rel. Hartung v. Milwaukee,* 102 Wis. 509, 78 N. W.
756, is also instructive.   After the decision in *In re Hartung,
supra,* the relator went to the circuit court and, after refusal
by the attorney general, was allowed to bring an action in the
circuit court in the name of the state to enjoin the further
continuance of the alleged public nuisance.   The case was
tried on the merits and an injunction refused, and on appeal
to this court it was held that the circuit court was not given
the writ of injunction for prerogative purposes, as this court
was, and that hence the action below was never in fact an ac-
tion by the state, notwithstanding its title, but was an action
by a private party.

In view of this last named decision, the recent case of *State
ex rel. Van Alstine v. Frear,* 142 Wis. 320, 125 N. W. 961,
becomes interesting, if not important.   This case was an ac-
tion brought in the circuit court in the name of the state, after
refusal to act by the attorney general, upon the relation of a
taxpayer, the object being to enjoin the secretary of state and
state treasurer from carrying out the provisions of the pri-
mary election law, and especially from auditing or paying
claims or bills for expenses arising under the law, on the
ground of unconstitutionality of the law.   The jurisdiction
of the circuit court in this case was not challenged by de-
murrer, nor was it raised or considered either in the lower
court or in this court, yet it seems quite manifest that it was
a case where injunction was used in the circuit court for pre-

rogative purposes, contrary to the principle laid down in the case of *State ex rel. Hartung v. Milwaukee,* just cited. However, as the question of jurisdiction passed *sub silentio,* the case is not significant.

Before proceeding to draw general conclusions from these decisions as to the field of the original jurisdiction, so far as any field has been marked out by the decisions, it may be well, in order to avoid misapprehension, to notice the fact that the legislature by sec. 3200, Stats. (1898), has consented that the state may be sued in the supreme court by any person having a just claim which has been disallowed by the legislature. Actions brought under this section are, of course, brought by virtue of the consent of the state, without which the sovereign itself cannot be sued. Nothing said in this opinion is to be construed as having any bearing on this section or the actions brought under it.

The affirmative result of the significant cases since the *Railroad Cases* is, as it seems to us, that the original jurisdiction of this court may be rightly invoked when there is a showing made either that (1) a citizen is wrongfully deprived of his liberty; (2) a state office has been usurped; (3) a franchise grantable only by the state has been usurped, abused, or forfeited; (4) a law regulating public-service corporations in the interest of the people is systematically disobeyed and set at naught; (5) a navigable river, which the state is bound to keep open as a highway for all, is obstructed or encroached upon, or a public railroad built under a charter granted by the state is about to be destroyed; (6) a state officer declines to perform a ministerial duty, in the performance of which the people at large have a material interest; (7) a state officer is about to perform an official act materially affecting the interests of the people at large, which is contrary to law or imposed upon him by the terms of a law which violates constitutional provisions; or (8) the situation is such, in a matter

*publici juris,* that the remedy in the lower courts is entirely lacking or absolutely inadequate, and hence jurisdiction must be taken or justice will be denied. It is not meant by this attempted classification that no cases which do not fall within one or the other of the classes can ever call for the exercise of the original jurisdiction, but simply that cases falling within these general classes have been held to be properly within the original jurisdiction.

In addition to these eight affirmative propositions the decided cases justify the statement of several negative propositions which are also helpful upon the general question. These are (1) a case, although involving a question *publici juris,* will not come within the jurisdiction if it be only local in its effect, subject only to the exception named in the eighth class; (2) a case involving a mere private interest, or one whose primary purpose is to redress a private wrong, will not be entertained; (3) a case will not be dismissed, however, because there is a private interest involved with the public interest, provided the private interest be incidental merely, and the vindication of the public right be the primary purpose of the action; (4) an action involving a private as well as a public interest will not be dismissed merely because the private interest may drop out, provided the public and private interests be severable and the public interest still exists; (5) the constitution has not given the circuit court the power to use the writ of injunction as a prerogative jurisdictional writ, as it has been given to the supreme court, hence the circuit court has not the power, in an action not brought by the attorney general but on the relation of a private citizen only, to use the writ for prerogative purposes.

It seems to us now that the real fundamental philosophy of the original jurisdiction and its use has not been at all times fully apprehended by the court, even since the elaborate discussion in the *Railroad* and *Eau Claire Cases,* but after this

review of the authorities it seems quite simple, and it really comes down to a few propositions which when thoroughly understood solve many difficulties.

This transcendent jurisdiction is a jurisdiction reserved for the use of the state itself when it appears to be necessary to vindicate or protect its prerogatives or franchises or the liberties of its people; the state uses it to punish or prevent wrongs to itself or to the whole people; the state is always the plaintiff and the only plaintiff, whether the action be brought by the attorney general, or, against his consent, on the relation of a private individual under the permission and direction of the court.    It is never the private relator's suit; he is a mere incident; he brings the public injury to the attention of the court, and the court, by virtue of the power granted by the constitution, commands that the suit be brought by and for the state.    The private relator may have a private interest which may be extinguished (if it be severable from the public interest), yet still the state's action proceeds to vindicate the public right.    The fact that in many cases, as for example cases of unlawful imprisonment, the private wrong and the public wrong are so closely identified that the ending of the private wrong necessarily puts an end to the public wrong makes no difference with the principle.

These propositions, if correct, and we believe they are, demonstrate very clearly that there can be no such thing as a taxpayer's action (as that action is known in the circuit courts) brought in the supreme court within the original jurisdiction.    The philosophy of the taxpayer's action in the circuit court is that the taxpayer is a member of a municipal corporation, who, by virtue of his contributions to the funds of the municipality, has an interest in its funds and property of the same general quality as the interest of a stockholder in the funds of a business corporation, and hence when corporate officers are about to illegally use or squander its funds or property he may appeal to a court of equity on behalf of him-

self and his fellow stockholders (*i. e.* taxpayers) to conserve and protect the corporate interests and property from spoliation by its own officers.

The taxpayer himself is the actual party to the litigation, and represents not the whole public, nor the state, nor even all the inhabitants of his municipality, but a comparatively limited class, namely, the citizens who pay taxes. In short, he sues for a class.

No such thing is known in the exercise of the original jurisdiction of this court. In actions brought within that jurisdiction the state is the plaintiff and sues to vindicate the rights of the whole people.

The *Bolens* case cannot, therefore, be held to come within the original jurisdiction of this court, if it be a mere taxpayer's action.

This conclusion, however, by no means leads to the result that the original jurisdiction may not properly be used at the instance and upon the relation of a private individual to stay by appropriate writ the expenditure of the state's funds for purposes expressly or by necessary implication forbidden by the constitution. Such use of funds by a state officer is certainly as much a breach of duty and an injury to the state as the refusal to pay out funds which have been lawfully appropriated, or the failure to obey the provisions of general election laws, but in such case the action is the action of the state as truly as if brought by the attorney general, not the action of the tax-paying relator.

If this be true, we can see no logical escape from the conclusion that, where state officials are about to spend the state's money in executing an unconstitutional law, the state may prevent the threatened misapplication of its funds by the same means. This seems to us the only logical basis upon which the case of *State ex rel. Raymer v. Cunningham,* 82 Wis. 39, 51 N. W. 1133, can rest.

But it must be recognized that such a power is extreme.

To arrest the hand of a state officer as he is about to carry out the command of the legislature is indeed a serious step, one not to be taken summarily or without profound consideration.    As the power is great, it should be exercised with a wisdom and discretion commensurate with its greatness.    No trivial grounds should impel the court to permit its exercise. This court will certainly not feel obliged in every case where there is a threatened expenditure of state funds under a law of doubtful constitutionality to allow an action of this nature to be brought in the name of the state, but will feel entirely free to leave the question of constitutionality to be settled as it may arise in ordinary litigation.    The defiance of express or implied constitutional commands may be so flagrant and patent as to make the exercise of this great power appear justifiable, if not absolutely necessary, and in such case it will be exercised courageously.    This court will, however, judge of the exigency in each case as it arises, and will endeavor to guard the great power from being used in trifling cases or to accomplish ulterior purposes.

In the present case we go no further than to state these general principles.    We do not find it necessary to decide whether the alleged illegal expenditure of funds alone presents a case of such exigency as to justify the use of the original jurisdiction of this court to prevent such expenditure. There are other and more important features in the present case which in our judgment present a proper case for the exercise of the original jurisdiction.

The law which is attacked here, if it be valid, makes a radical change in the present system of taxation over the whole state.

Since the days when Hampden refused to pay the ship money, unjust taxation has been deemed by English-speaking nations, at least, to vitally concern, if not to destroy, the liberties of the people.    Such taxation has been deemed to justify armed resistance and, if need be, revolution.    Insistence

upon it cost Charles I. his life and England an empire.  If this law in its essential provisions violates constitutional provisions and hence is void, taxation under it is, of course, unjust, and the sums which may be collected under it are unlawfully collected.  It makes in terms a very sweeping change in the methods of taxation in every taxing district of the state, and shifts the burdens of taxation so that many will pay more than under the old system, while many will pay less.  If it should go into operation for a year or two and then be held unconstitutional in some actual case, the confusion created in the financial affairs of the state and of every municipality would unquestionably be great.  We cannot but regard any serious question as to the constitutionality of such a law as a question seriously affecting the prerogatives of the state, as well as the liberties of the people, hence we conclude that the case presented is one justly calling for the exercise of the original jurisdiction of this court.

Many provisions of the law are attacked as offending against either the federal or the state constitution.  We shall only treat the contentions which might from some point of view be considered as going to the validity of the whole act.  As to those minor provisions which are properly to be regarded as matters of detail, we shall express no opinion. This is in accord with our well established custom in cases of this nature.  *Wadhams Oil Co. v. Tracy,* 141 Wis. 150, 123 N. W. 785; *State ex rel. Buell v. Frear,* 146 Wis. 291, 131 N. W. 832; *Borgnis v. Falk Co.* 147 Wis. 327, 133 N. W. 209.

A few general observations may not be out of place before taking up for consideration the specific claims of unconstitutionality which are urged upon our attention.

The law in question, if valid, works a very important change in the general taxation policy of the state.  Ever since the foundation of the state government it has been the policy of the state to levy its general taxes upon property

either real or personal, with the exception of the inheritance
taxes and the license taxes first levied on railroads and lat-
terly upon other public-service corporations.    The constitu-
tion of the state, though not forbidding excise taxation, as
determined in the ·inheritance tax case (*Nunnemacher v.
State,* 129 Wis. 190, 108 N. W. 627), contained only one
brief section on the general subject of taxation, namely, sec. 1
of art. VIII, reading as follows: "The rule of taxation shall
be uniform, and taxes shall be levied upon such property as
the legislature shall prescribe."    Under this section property
taxation has been the rule, with the exceptions just noted,
until the passage of ·the present law.    This law, however, is
but the concrete embodiment of a popular sentiment which
has been abroad for some time.    The legislatures of 1905 and
1907 passed a resolution recommending the amendment of the
section of the constitution quoted, by the addition of the fol-
lowing words: "Taxes may also be imposed on incomes, privi-
leges, and occupations, which taxes may be graduated, and
progressive and reasonable exemptions may be provided."
This change was ratified by the people at the general election
held in November, 1908, and thus was clearly expressed by
both legislature and people the idea that some form of gen-
eral taxation in addition to, or in place of, property taxation
might well be adopted.    The attempt has now been made to
carry out this idea, and we have the result before us in the
present law.    With the political or economic policy or ex-
pediency of the law we have nothing to do.    If it be within
constitutional lines, it represents and embodies public policy,
because it is enacted by that branch of the government which
determines public policy.

It may be well to note, however, that income taxation is no
new and untried experiment in the field of taxation.    It has
been in use in various forms, and generally. with the pro-
gressive feature, by many of the civilized governments of the
world for decades, which in some instances run into centu-

ries. It has been used at various times by nearly or quite twenty of our own states, and is now in use in several of them. It was used for a brief period by the government of the United States, and is now in successful operation in practically all of the great nations of the civilized world except the United States. The fundamental idea upon which its champions rest their argument in its favor is that taxation should logically be imposed according to ability to pay, rather than upon the mere possession of property, which for various reasons may produce no revenue to the owner.

It is argued that there should be as nearly as practicable equality of sacrifice among the various taxpayers, and that a tax levied at an uniform or proportional rate can rarely, if ever, produce equality of sacrifice; that one per cent. of a small income, which just suffices to support its owner, is a far larger relative contribution to the public treasury than one per cent. of an income so large that it cannot be exhausted by its owner except by means of lavish and extravagant expenditures.

We are not to be understood by these remarks to be advancing arguments in support of the policy or expediency of the law, but simply as showing that in passing the law the legislature is only adopting a scheme of taxation which has been approved for many years by many of the most enlightened governments of the world, and has the sanction of many thoughtful economists.

By the present law it is quite clear that personal property taxation for all practical purposes becomes a thing of the past. The specific exemptions of all money and credits and the great bulk of stocks and bonds, as well as of all farm machinery, tools, wearing apparel, and household furniture in actual use, regardless of value, goes far to eliminate taxation of personal property; while the provision that he who pays personal property taxes may have the amount so paid credited on his income tax for the year seems to put an end to any effective

taxation of personal property. That taxation of such property has proven a practical failure will be admitted by all who have given any attention to the subject. Doubtless this was one of the main arguments in the legislative mind for the passage of the present act. By this act the legislature has, in substance, declared that the state's system of taxation shall be changed from a system of uniform taxation of property (which so far as personal property is concerned has proven a failure) to a system which shall be a combination of two ideas, namely, taxation of persons progressively, according to ability to pay, and taxation of real property uniformly, according to value.

We pass from these general observations to consideration of the specific grounds of unconstitutionality alleged.

1. It is first claimed with much earnestness and ability that the act violates the provisions of the XIVth amendment to the federal constitution. One of the contentions under this head is that the progressive features of the act are discriminatory, if not absolutely confiscatory. Another contention is that the act provides for double taxation, and for both reasons it is claimed that it denies to citizens the "equal protection of the laws."

It is said in support of this contention that the United States supreme court in the *Pollock Case* (*Pollock v. Farmers' L. & T. Co.* 157 U. S. 429, 15 Sup. Ct. 673) has held that taxation of income derived from land is in fact taxation of the land itself, hence that the act provides for double taxation, first of the land *in specie,* and next of the income therefrom. It seems that this claim may be very easily met. The question in the *Pollock Case* was whether the taxation of rentals of land was direct taxation within the meaning of that term as used in the constitution of the United States, and it was held to be the same, in substance, as a tax on the land itself, and hence a direct tax. This may be admitted for the purposes of the case, but it does not appear to in any way decide the question here at issue, or even to be very persua-

sive.    The question there was of the power of Congress under
that clause of the federal constitution which forbids any di-
rect federal tax except one levied in proportion to the popula-
tion.    The question here is primarily of the power of the
legislature of Wisconsin under its constitution to levy an in-
come tax in addition to a real-estate tax, and, secondarily,
whether such a tax denies to any one the equal protection of
the laws.

The inapplicability of the rule of the Pollock Case to the
case here presented seems so plain as to require little com-
ment.    There can be no doubt of the proposition that income
taxation of a progressive character, in addition to taxation of
property, is directly authorized by the constitution of Wis-
consin, as amended in 1908.    Words could hardly be plainer
to express that idea than the words used.    From them it
clearly appears that taxation of property and taxation of in-
comes are recognized as two separate and distinct things in
the state constitution; both may be levied, and lawfully levied,
because the constitution says so.    However philosophical the
argument may be that taxation of rents received from prop-
erty is in effect taxation of the property itself, the people of
Wisconsin have said that "property" means one thing, and
"income" means another; in other words, that income taxa-
tion is not property taxation, as the words are used in the con-
stitution of Wisconsin.

That they may say so and lawfully say so there is no doubt,
unless some restriction in the federal constitution is thereby
violated, and we are pointed to none, save the clause guaran-
teeing "equal protection of the laws."    That this clause does
not apply to the case seems very well settled by the language
of the supreme court of the United States itself in the great
case of *Mich. Cent. R. Co. v. Powers,* 201 U. S. 245, at
pages 292, 293, 26 Sup. Ct. 459, where it is said:

"There is no general supervision on the part of the nation
over state taxation, and in respect to the latter the state has,
speaking generally, the freedom of a sovereign both as to ob-

jects and methods.   It was well said by Judge Wanty, delivering the opinion of the circuit court in this case (p. 232):
"'There can at this time be no question, after the frequent and uniform expressions of the federal supreme court, that it was not designed by the XIVth amendment to the constitution to prevent a state from changing its system of taxation in all proper and reasonable ways, nor to compel the states to adopt an ironclad rule of equality, to prevent the classification of property for purposes of taxation, or the imposition of different rates upon different classes.   It is enough that there is no discrimination in favor of one as against another of the same class, and the method for the assessment and collection of the tax is not inconsistent with natural justice.'"

This doctrine has been stated and restated in many forms, but with substantially the same meaning, in many federal cases, beginning with the case of *Bell's Gap R. Co. v. Pennsylvania,* 134 U. S. 232, 10 Sup. Ct. 533, nearly all of which are cited in the *Powers Case* at the close of the clauses above quoted.   It seems unnecessary to quote or descant upon them. The sum and substance of it is that the XIVth amendment never was intended to lay upon the states an unbending rule of equal taxation; the states may make exemptions, levy different rates upon different classes, tax such property as they choose, and make such deductions as they choose, and, so long as they obey their own constitutions and proceed within reasonable limits and general usage, there is no power to say them nay.   With regard to the progressive feature, it is aptly said in *Knowlton v. Moore,* 178 U. S. 41, at page 109, 20 Sup. Ct. 747, by the present chief justice, that "taxes imposed with reference to the ability of the person upon whom the burden is placed to bear the same have been levied from the foundation of the government.   So, also, some authoritative thinkers, and a number of economic writers, contend that a progressive tax is more just and equal than a proportional one. In the absence of constitutional limitation, the question whether it is or is not is legislative and not judicial."

No more need be said as to the progressive feature. Expressly permitted as it is by our own constitution, and clearly not within the inhibitions of the XIVth amendment, the progressive feature is in no respect objectionable.

It was suggested in the *Knowlton Case, supra,* that possibly the case might arise where exactions so arbitrary and confiscatory might be imposed under the guise of progressive taxation that the question would arise whether judicial power should not afford relief under inherent and fundamental principles of justice; but as there is plainly no ground for such a contention here, there is no need of considering the question.

2. It is argued that the provisions which deny to nonresidents the exemptions which are allowed to residents, and which allow the board of review to increase the assessment of a nonresident without notice, while requiring notice to be given to a resident, violate sec. 2 of art. IV of the federal constitution, which provides that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." The question as to the validity of the provision allowing exemptions to residents of the state and denying them to nonresidents is raised, and receives some attention in the briefs, but was not mentioned in the oral arguments. We regard it as a question involved in considerable doubt, and one not necessary to be passed upon now. It cannot be imagined for a moment that the legislature would have failed to pass the act had it not contained this provision, and we prefer to wait until the question is presented in a concrete case, at which time there will be opportunity to fully consider it after comprehensive briefs and arguments. It seems that the supreme court of the United States decided in *Ward v. Maryland,* 12 Wall. 418, at page 430, that one of the privileges and immunities protected by the section quoted is the right "to be exempt from any higher taxes or excises than are imposed by the state upon its own citizens." Other decisions relied on upon the same side are *In re Stanford's Es-*

*tate,* 126 Cal. 112, 54 Pac. 259, 58 Pac. 462, and *Sprague v. Fletcher,* 69 Vt. 69, 37 Atl. 239, 37 L. R. A. 840, and the cases cited in the latter case. On the other side reliance is placed on the analogy of the laws providing for exemptions from execution seizure, which confine their benefits to residents, and upon *Travellers' Ins. Co. v. Connecticut,* 185 U. S. 364, 22 Sup. Ct. 673.

So far as the provision allowing the increasing of an assessment against a nonresident without notice is concerned, this would seem to be almost a necessity if power to increase the assessment of a nonresident is to be given to the board at all, otherwise the nonresident would only need to stay out of the state to prevent the possibility of an increase of his assessment. We do not consider that this latter provision affects in any way the privileges or immunities which are covered by the constitutional provision cited.

3. The claim is made that the law violates the constitutional guaranties of local self-government, by placing the power of appointment of the various assessors of incomes in the state tax commission.

These guaranties in substance are (1) that all county officers, except judicial officers, shall be chosen by the electors of the county every two years (sec. 4, art. VI, Const.); (2) that all county officers whose election or appointment is not provided for by the constitution itself shall be elected by the electors or appointed by the proper county authorities, as the legislature shall direct; (3) that all city, town, and village officers whose election or appointment is not provided for by the constitution shall be elected by the electors of the proper municipality or appointed by such municipal authorities as the legislature shall designate; (4) that all other officers whose election or appointment is not provided for by the constitution, and all officers whose offices may thereafter be created by law, shall be elected by the people or appointed as the legislature may direct. Sec. 9, art. XIII, Const. These provisions have been quite fully considered and expounded by

this court in several cases, and it seems unnecessary to add to the quite complete discussions of the subject to be found in *O'Connor v. Fond du Lac,* 109 Wis. 253, 85 N. W. 327, and *State ex rel. Gubbins v. Anson,* 132 Wis. 461, 112 N. W. 475.

It is sufficient to say that we do not regard the office of assessor of incomes, as provided for by this act, as either a county, city, town, or village office, nor do we regard it as an office existing in substance at the time of the adoption of the constitution, or essential-to the existence or efficiency of either of said municipal divisions of the state, but rather an entirely new office within the fourth class above named, whose election or appointment may be provided for in any way that the legislature may in its discretion direct.

The further contention is made that it is a delegation of legislative power to vest in the state tax commission the power of appointing assessors of incomes and fixing their salaries. This objection is met and fully answered in *State ex rel. Gubbins v. Anson, supra,* and in the *Revisor's Case (In re Appointment of Revisor of Statutes)* 141 Wis. 592, 124 N. W. 670.

4. A number of contentions are made with regard to the exemption features of the act, and, first, it is said under this head that the allowance of exemptions to individuals and the denial of them to partnerships is unjust discrimination. The question depends, of course, upon whether there is any valid ground for classification. Is there such a substantial difference between the classes as to reasonably suggest or call for the propriety of different treatment? We are clearly of opinion that this question must be answered in the affirmative. A partnership ordinarily has certain distinct and well known advantages in the transaction of business over the individual, arising from the fact that it allows a combination of capital, brains, and industry, and thus makes it possible to accomplish many things which an individual in the same business cannot accomplish. Further than this, however, there is another

consideration.    If the partner have individual income from
other sources than the partnership business (as many do), his
exemptions will be allowed to him out of the individual in-
come, and thus, if he were also allowed exemptions from the
partnership income, he would be allowed double exemptions.
Altogether there seems to be ample reason for the classifica-
tion.    The exemptions themselves do not seem to be seriously
attacked, nor do we see any reason why they should be.    The
most striking exemption is that of life insurance to the
amount of $10,000 in favor of one legally dependent on the
deceased, but while this is somewhat large we cannot say that
it is unreasonable, nor that there is not ample ground for clas-
sifying legally dependent persons, and extending an exemp-
tion to them which is denied to others.

Attack is made upon the provision which directs that a tax-
payer who has paid a personal property tax for the year shall
be entitled to have the amount so paid credited upon his in-
come tax.    There is said to be no just ground for this dis-
tinction, but it seems quite clear to us that there is; in fact it
seems to be rather a means of equalizing the burden of the
new form of taxation than to be really an exemption.    It
was evidently done with the idea of accomplishing, without
too violent a shock to taxing machinery, the substantial elimi-
nation of personal property taxation and the substitution
therefor of "ability" taxation.  ˙ The practical result is that
the taxpayer who has taxable personal property and the tax-
payer who has none each pays taxes according to his ability
as evidenced by his income.

In this connection, though not perhaps in its logical order,
may be considered the objection to that provision of the act
which directs that the estimated rental of residence property
occupied by the owner shall be considered as income.    It is
said that this is not income, and that calling it income does
not make it income.    It may be conceded that things which

are not in fact income cannot be made such by mere legislative fiat, yet it must also be conceded, we think, that income in its general sense need not necessarily be money. Clearly it must be money or that which is convertible into money. The Century Dictionary defines it as that which "comes in to a person as payment for labor or services rendered in some office, or as gain from lands, business, the investment of capital, etc." The clause was doubtless inserted in an effort to equalize the situation of two men each possessed of a house of equal rental value, one of whom rents his house to a tenant, while the other occupies his house himself. Under the clause in question the two men with like property are placed upon an equal footing, and in no other way apparently can that be done. Under the English income tax laws it has been held that where a man has a residence or right of residence which he can turn into money if he chooses, and he occupies the residence himself, the annual value of the rental forms part of his income. *Corke v. Fry,* 32 Scottish Law Rep. 341. We discover no objection to the provision in question.

Objection is also made to the provision that the income of a wife living with her husband shall be added to the income of the husband, and the income of each child under eighteen years of age living with its parent or parents shall be added to that of the parent or parents. This is another case of classification, and it is only justifiable in case there is some substantial difference of situation which suggests the advisability of difference of treatment. We think there clearly is such a difference, in this, that experience has demonstrated that otherwise there will be many opportunities for fraud and evasion of the law, which the close relationship of husband and wife or parent and child makes possible, if not easy. The temptation to make colorable shifts and transfers of property in order to secure double or even triple exemptions, if there were not some provision of this kind in the law, would unquestion-

ably be very great.    There is no such temptation or opportunity in the case of the single man, or the man and wife who are living separately.

One further objection we overrule here without comment, for the reason that it seems very unsubstantial, namely, the objection that the law is retroactive and void, because assessed on incomes received during the entire year 1911, while it did not go into effect until July 15th of that year, and also because it includes profits derived from the sale of property purchased at any time within three years previously.

5. A strong argument is made attacking the validity of sec. 1087m—22, which provides in substance that the income of a resident derived from different political subdivisions of the state shall be combined for the purpose of determining the exemptions and the rate, while the income of a nonresident is to be separately assessed and taxed in each of the municipalities from which it is derived.    A table is submitted showing that under this rule if A., a resident, derived $1,000 from each of thirteen different towns or cities he will be required to pay a tax of $367, because his income is aggregated, and consequently becomes in large part subject to the higher rates, while if B., a nonresident, receives the same income from the same sources, he will only pay the smallest rate, i. e. one per cent. of each $1,000, amounting to only $130.    This, it is said, is unjust discrimination against the residents of the state, and deprives them of the privileges and immunities which are granted to the citizens of other states, in violation of the federal constitution.    This presents the question whether such a discrimination can be made between residents and nonresidents, only this time the discrimination seems to be against the resident and in favor of the nonresident.    This question also we deem one not necessary to be decided now, and we intimate no opinion upon it.    It does not seem that the case will frequently arise, but if it does it can be then

treated.    We do not regard it as in any respect important in considering the validity of the act as a whole.

6. Much complaint is made of that part of sec. 1087m—6 which provides a different rate of taxation for the income of corporations from the rate prescribed for individuals, and this also is said to be unjust discrimination.    Again the question is whether there be substantial differences of situation between individuals and corporations which suggest and justify this difference in treatment, and again it seems that the answer must be Yes.    The corporation is an artificial creation of the state endowed with franchises and privileges of many kinds which the individual has not.    It might be said with truth that the clause could be justified on the ground that it is an amendment to every corporate charter, which the legislature has the undoubted right to make, but it is not necessary to rely on that proposition.    The corporate privileges, which are exclusively held by corporations, and the real differences between the situation of a corporation and an individual, among which may be mentioned the fact that the corporation never is obliged to pay an inheritance tax, plainly justify a difference of treatment in the levying of the income tax. Were the income tax a tax upon property, there could be no difference in rate, for taxation of property must still be on a uniform rule, but, as has been heretofore noted, it is not a tax upon property within the meaning of our constitution.

7. The minor objections that the law in terms includes all corporations and does not specifically except national banks, nor name the officers whose salaries cannot be constitutionally taxed, are very easily disposed of.    If national banks or any public officers cannot constitutionally be subjected to the tax, the law will be construed as not applying in such cases, just as sec. 1770b, Stats. (Laws of 1907; ch. 562), although in general terms covering all business, has been held not to apply to interstate business.

8. We come now to certain serious objections which are
made to the provisions of secs. 1087*m*—2, subd. 3, and
1087*m*—3 (b). The first of these sections provides, in sub-
stance, that a resident shall be taxed upon all of his income
arising from rentals, stocks, bonds, securities, or evidences of
debt, whether the same be derived from sources within or
without the state, but that the nonresident shall only be taxed
on income derived from sources within the state, or within its
jurisdiction, but that any person doing business both within
and without the state shall, as respects that part of his income
not derived from rentals, stocks, bonds, and securities, be
taxed only on that proportion thereof which is derived from
business transacted and properly located within the state, to
be determined in the manner specified in subd. *e* of sec. 1770*b,*
Stats. (Laws of 1907, ch. 562), as far as applicable.

The general purpose of the section is quite evident, namely,
to tax a resident upon his whole income, and a nonresident
only upon his income plainly derived from sources within the
territorial jurisdiction of the state, and to provide that where
either person is engaged in a business interstate in its charac-
ter he shall only be taxed on that portion of the income de-
rived from business transacted and property located within
the state, according to the rule prescribed in sec. 1770*b* for
determining that proportion of capital stock of a foreign cor-
poration doing business in this state which must be reported
to the secretary of state. The rule so imported into the stat-
ute is an arbitrary rule, and need not be stated at length in
the view we now take of our duty with regard to this conten-
tion.

Two fundamental objections are made to this section: *first,*
that the state cannot tax the incomes of nonresidents no mat-
ter from what source derived, and, *second,* that the attempt
to tax a part of the profits derived from an interstate business,
under the rule adopted, must necessarily result in a taxation
of the receipts of interstate commerce, and hence a regulation

thereof, which is in violation of that clause of the federal constitution which gives to Congress the power to regulate commerce between the states.

We shall decide neither of these questions now. If the section be open to either or both of these objections, or any others, we cannot regard that fact as fatal to the act. The legislature evidently intended to avoid both of the objections made; they had a difficult and delicate subject to deal with. Had they been authoritatively informed that they could not constitutionally tax a nonresident's income at all, and could not divide the income derived partially from state and partially from interstate business, we have no idea that they would on that account have abandoned their purpose to pass the law. Again, if they provided an improper rule for the division (conceding that a division can be made at all), there seems no reason why the rule may not be rejected and the proper rule, which will carry out the fundamental purpose of the provision, be used. In any event we are fully satisfied that the rejection of any or all of the provisions objected to in this section cannot reasonably be held to invalidate the whole act.

When these questions are presented to us in a case actually arising, we shall be able to give them far more critical examination in the light of arguments and briefs directed exclusively to them. For the present, therefore, we leave the various objections to the validity of those parts of this section which are attacked without answer.

For the same reasons we decline at the present time to pass upon the objections to the second section referred to under this head. That section provides generally that a proportion of the interest on corporate bonds (to be ascertained in the same manner as the proportionate taxable income is ascertained in the preceding section) shall be taxed against the bondholders and paid by the corporation, and deducted from the next interest payment on the bonds. Many serious objections on behalf of foreign bondholders are made to this

provision, from the fundamental objection that there is no power to levy such a tax at all, to the minor objection that the rule for ascertaining the proportion is incorrect. As we do not deem it necessary to pass upon any of these objections, we need not make particular statement concerning them now. The subject will be entirely open for discussion when an actual case arises necessitating a decision upon this section.

We have reviewed all of the objections made to the law which we deem of sufficient importance to require specific mention or treatment. As a whole we regard the law constitutional. If there be provisions which will not stand the test, they are not provisions of such a nature that they must be considered as the inducement to or as the compensation for the balance of the law. They may drop out, and leave the law intact in its fundamental and essential features.

As to the *Winding* case, commenced in the circuit court, a few words should be said. This was an action brought by a number of persons and corporations who alleged that they were taxpayers and that they and their fellow taxpayers would be unlawfully taxed and compelled to pay large sums under the alleged unconstitutional law, thus causing a multiplicity of suits; and praying that the officers of the state be enjoined from executing the law and from paying any moneys out of the public treasury in its execution.

This seems to be a taxpayers' action pure and simple, brought in the circuit court to stay the hands of state officers from paying moneys out of the state treasury. We have already held in this opinion that no taxpayer's action can be maintained in the supreme court against the auditing or disbursing officers of the state. If such relief is sought it must be in an action by the state itself, either brought by the attorney general, or, in case of his refusal, by authority of the court itself, upon the relation of a private citizen. It would seem, *a fortiori,* that no taxpayer's action should be entertained in the circuit court where the purpose is to halt the auditing and

disbursing officers of the state.   We regard this as the better
administration.   It is enough that this court has the power to
authorize such an action if the exigency demands.   To divide
up that power and scatter it among the trial courts of the
state, and allow every such court to judge of the exigency,
might well lead to the bringing of many improvident actions.
It is fitting that such an extreme power be vested in this
court alone.

The result is that in the *Bolens* action the demurrer to the
complaint must be sustained upon the merits, and judgment
ordered dismissing the complaint without costs.   In the
*Winding* case the order sustaining the demurrers must be af-
firmed, and the action remanded with directions to dismiss
the complaint for lack of jurisdiction.

*By the Court.*—It is so ordered.


TIMLIN, J. (*dissenting in part*).   Ch. 658, Laws of 1911,
relating to the taxation of incomes and making an appropria-
tion for salaries of officers and other expenses of executing
and administering the statute, was enacted by the legislature,
approved by the governor, and published July 15, 1911.
The act went into effect as law from and after its passage and
publication and officers were appointed to administer this
law, but no assessment or levy of tax had been made and the
time for enforcing the provisions of this act had not arrived
when these suits were begun.   I shall consider these suits
separately, taking up first that begun in the circuit court by
*Arthur Winding* and *F. W. Gezelschap* individually and as
copartners, the *Wisconsin Trust Company,* a corporation, sev-
eral other natural persons, a national bank, and the *Milwau-
kee Coke & Gas Company,* a corporation.   These plaintiffs,
evidently selected because of diversity of relations to the act
in question, affected differently by different sections of the
act, but all desirous of escaping payment of the tax, hence in-
terested in the question of the constitutionality of the statute,

join in a taxpayers' suit in their own behalf and in behalf of
all the other income taxpayers of the state against three mem-
bers of the state tax commission, the secretary of state, and
the state treasurer.    The cause of action alleged is that the
act above referred to is null and void because in violation of
the constitution of the state of Wisconsin and of the consti-
tution of the United States, and that the members of the
state tax commission will, unless restrained by injunction,
through their subordinate appointees, acting under said
statute, exact and collect large sums of money from many
residents and citizens of Wisconsin, which collections will
lead to a multiplicity of suits to recover back the moneys so
collected or to a multiplicity of suits by the state to collect the
fines and penalties provided in and by said act to be enforced
against those persons who refuse to comply with the act.    On
these grounds they pray for an injunction restraining the
state tax commissioners and their subordinate administrative
officers from attempting to enforce the act and restraining the
secretary of state, who is by the state constitution auditor,
from auditing, and the state treasurer, who is also a constitu-
tional officer, from paying salaries, bills, or expenses of any
kind incurred under or payable by the terms of the act in
question.    This act carries in it a legislative appropriation
for such purpose.    This is therefore a bill by taxpayers to
enjoin the enforcement of a statute levying taxes upon in-
comes on the ground that the statute is unconstitutional,
which bill is sought to be upheld upon the equitable ground
that it takes the place of a multiplicity of suits or actions, but
so far as the secretary of state and the state treasurer are con-
cerned it is a bill to restrain the payment of moneys out of
the state treasury for the purpose of administering or enforc-
ing a law claimed to be invalid.    As to the latter defendants,
who have no part in executing or enforcing the act except
auditing and paying bills, salaries, and expenses under the
legislative appropriation, the bill is maintainable only upon

the ground that each individual taxpayer in the state has a proprietary interest cognizable in equity in the funds of the state treasury in analogy to the shareholder in a private corporation or the taxpayer in a municipal corporation. *Land, L. & L. Co. v. McIntyre,* 100 Wis. 245, 256, 75 N. W. 964, and cases.

The circuit court sustained a demurrer to this complaint, and from that order the plaintiffs appealed to this court. This demurrer went expressly to the point that the circuit court had no jurisdiction of the action, and also to the point that the complaint did not state facts sufficient to constitute a cause of action; so that both these questions are before us on this appeal. Generally speaking the law does not give a private remedy for the redress of a public wrong. One damaged or threatened by an unlawful act which affected him only as it affected that section of the public holding the same legal relation to such act, could not at common law or in equity maintain an action against the doer of such act. And it mattered not that his damages were greater. If they were of the same nature and differed only in degree the wrong was still a public wrong. The rule has been applied in a great variety of cases in this court. *Enos v. Hamilton,* 27 Wis. 256; *Cohn v. Wausau B. Co.* 47 Wis. 314, 2 N. W. 546; *Baier v. Schermerhorn,* 96 Wis. 372, 71 N. W. 600; *Stedman v. Berlin,* 97 Wis. 505, 73 N. W. 57; *Liermann v. Milwaukee,* 132 Wis. 628, 113 N. W. 65; *Linden L. Co. v. Milwaukee E. R. & L. Co.* 107 Wis. 493, 83 N. W. 851; *Pedrick v. Ripon,* 73 Wis. 622, 41 N. W. 705; *Bell v. Platteville,* 71 Wis. 139, 36 N. W. 831; *Stone v. Oconomowoc,* 71 Wis. 155, 36 N. W. 829; *Gilkey v. Merrill,* 67 Wis. 459, 30 N. W. 733, and cases cited; *Sage v. Fifield,* 68 Wis. 546, 32 N. W. 629; *Harley v. Lindemann,* 129 Wis. 514, 109 N. W. 570; *Foster v. Rowe,* 132 Wis. 268, 111 N. W. 688; *Carstens v. Fond du Lac,* 137 Wis. 465, 119 N. W. 117; *Nast v. Eden,* 89 Wis. 610, 62 N. W. 409.

It has been sometimes said by law writers and courts that this rule rested upon the consideration that, if one suit could be maintained in such case, each person affected might also bring suit and thus the defendant be ruined by litigation. This consideration has special significance and force in a state where the law permits suits to be brought by private persons against administrative officers charged with the duty of enforcing the law. Few officers would attempt an efficient administration at such risk, and the ultimate result must be either injustice or inefficiency. But there is another reason for the rule which lies deeper and upon a broader foundation of governmental policy. That is the policy which places the prosecution of public wrongs in the hands of the public prosecutors and out of the hands of those who may be actuated by private revenge or gain, malice, or political intrigue. *Biemel v. State,* 71 Wis. 444, 37 N. W. 244. If the state as a sovereign is to have its proper and lawful recognition in our jurisprudence, it is, in the absence of statute, subject to no defense of laches, no limitation of time, and no liability to suit, and it must also be regarded as the repository of governmental policy and political discretion. When and how it will assert and enforce its sovereign prerogatives is often a political question, a matter of state policy, and to leave these great questions in the hands of every private litigant has a tendency to create confusion in jurisprudence, lack of wisdom in state policy, and contempt for authority. In the great case of *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, Chief Justice RYAN said at page 529: "Relief against public wrong is confined to informations by the attorney general." See further, for illustration, *Saylor v. Pennsylvania C. Co.* 183 Pa. St. 167, 38 Atl. 598. The victim of robbery, battery, or arson may have a private action for damages against the wrongdoer, suspended, according to some, until the pending public or state prosecution is at an end, and not concluded by the result of the

public prosecution.   But there there is coincident and cotemporaneous with the public wrong a private wrong suffered by the victim, distinct and different from that suffered by any other member of the public.   Where all are affected alike by the wrongful act, the language of the cases and many of the actual adjudications indicate that there is no private actionable wrong, not merely a lack of remedy.   Cases *infra* and *supra*. An exception to these general rules was recognized in the case of taxpayers, first in this state, I think, in *Peck v. School Dist.* 21 Wis. 516, and this doctrine received the approval of the supreme court of the United States in *Crampton v. Zabriskie,* 101 U. S. 601.   Since then the scope of the taxpayer's action, so called, has been greatly extended by this court and its decisions have not always been consistent.   In *Peck v. School Dist., supra,* the action was brought by certain taxpayers whose personal property had been levied upon and advertised for sale to restrain local administrative officers from action taken contrary to statute and consequently outside of their jurisdiction, to the private injury of plaintiffs.   Their remedy for this conceded private wrong would ordinarily be at law.   But the contract which formed the basis for the tax was found to be fraudulent, thus arousing the jurisdiction of equity, and the injunction against the enforcement of the tax sustained upon the ground that, the jurisdiction of equity having once rightfully attached, it should be made effectual for the purposes of complete relief.   The decision of the court was written by Chief Justice Dixon.   When the question was presented about four years later in a suit by taxpayers involving no recognized ground of equity jurisdiction, but showing the plaintiffs to be taxpayers threatened with the enforcement of an illegal tax precisely as it is presented by the complaint in the instant case, except that there it was averred the local administrative officers acted without their statutory jurisdiction, while here it is averred that the legis-

lature of the state acted without its constitutional jurisdiction, the same distinguished jurist, denying the injunction, said among other things:

"The general principle that equity possesses no power to revise, control, or direct the action of public, political, or executive officers or bodies is of course well understood. It never does so at the suit of a private person, except as incidental and subsidiary to the protection of some private right or the prevention of some private wrong, and then only when the case falls within some acknowledged and well defined head of equity jurisprudence. It is upon this principle that bills to restrain the collection of a tax have in general been dismissed" (citing cases). "But there are other reasons why equity will refuse its aid in a case like this, and which are most ably pointed out in the opinions in *Doolittle v. Supervisors,* 18 N. Y. 155, and in *Sparhawk v. Union P. R. Co.* 54 Pa. St. 401. The grounds are too remote, intangible, and uncertain, and the public inconvenience which would ensue from the exercise of the jurisdiction would be enormous. It would lie in the power of every taxpayer to arrest all proceedings on the part of the public officers and political bodies in the discharge of their official duties, and, assuming to be the champion of the community, to challenge them in its behalf to meet him in the courts of justice to defend and establish the correctness of their *proposed official acts* before proceeding to the performance of them. A pretense more inconsistent with the due execution of public trusts and the performance of official duties could hardly be imagined." *Judd v. Fox Lake,* 28 Wis. 583.

This case has been cited and followed many times. In *Gilkey v. Merrill,* 67 Wis. 459, 30 N. W. 733, wherein it was expressly adjudicated that an action will not lie in behalf of a taxpayer to set aside the taxes of a city or other municipality generally, *Judd v. Fox Lake* is cited to support the rule that there must be some distinct principle of equity jurisprudence under which the case is brought other than the mere illegality of the general taxes and its necessary and usual consequences. In *Pedrick v. Ripon,* 73 Wis. 622, 41 N. W.

705, to the effect that the mere passage of a resolution and intent to enforce it are not sufficient to support a taxpayer's suit.  In *Sage v. Fifield,* 68 Wis. 546, 32 N. W. 629, to the same effect.  In *Foster v. Rowe,* 132 Wis. 268, 111 N. W. 688, to the effect that no action will lie by a taxpayer in his own behalf and in behalf of other taxpayers to restrain the levy and collection of the taxes of a municipality generally. See, also, *Harley v. Lindemann,* 129 Wis. 514, 109 N. W. 570.  If the equitable ground of the prevention of a multiplicity of suits could be invoked to support such a taxpayer's action for the reason that the collection of an invalid tax will breed a multitude of suits at law to recover back the taxes or on the ground that it will require a multitude of suits or proceedings in the nature of suits by the state to collect the taxes, then manifestly the foregoing cases were incorrectly decided, for all invalid tax levies give rise to suits to recover back the taxes, and generally the nonpayment of taxes is followed by penalties of some kind.  Such suits are also forbidden by the rule which prohibits the courts to entertain suits by a private citizen to vindicate a public right, or that which prohibits a court of equity from employing its preventive remedies so as to interfere in a wholesale way with the collection of the public revenues.  But I think they were correctly decided upon either ground.  See *Bell v. Platteville,* 71 Wis. 139, 36 N. W. 831, and reasons there given for refusing to entertain the taxpayer's suit; *Stone v. Oconomowoc,* 71 Wis. 155, 36 N. W. 829; *Harley v. Lindemann,* 129 Wis. 514, 109 N. W. 570; *Carstens v. Fond du Lac,* 137 Wis. 465, 119 N. W. 117.  In the latter case the right of a taxpayer to sue in behalf of other taxpayers is denied where the plaintiff merely seeks to relieve his property of a tax which he claims to be void.  In *Giblin v. North Wis. L. Co.* 131 Wis. 261, 111 N. W. 499, the cases are cited which hold that a decree in a taxpayer's suit is binding upon all the taxpayers and citizens of the municipality concerned in the litigation.  The taxpayer's suit

as both created and limited by judicial decisions in this state
has been productive of very beneficial results in preventing
municipal maladministration, conserving municipal funds
and property, and keeping fraudulent or erring municipal of-
ficers within their jurisdiction.     But the fact that it has
cured some ills does not prove it a panacea.     It has its limi-
tations, as above shown, founded upon sound policy, even
with respect to subordinate municipal officers.     For stronger
reasons those limitations must be applied when the suit is
state-wide in its operation and is in effect a suit against the
state to prevent the entire state levy and collection of a tax on
the averment that the law sought to be enforced is unconsti-
tutional.     The state as such has immunity from actions ex-
cept where expressly authorized by statute, and here no such
statute exists covering the instant case.     The state officers in
the execution of a law have a wider latitude of discretion
than municipal officers.     Taxpayers' suits against the latter
are brought to vindicate some law, here to annul a statute.
The taxpayer here attempts to represent a larger constitu-
ency, and the arrest by injunction of all the taxes of the state
surely implies a wider scope of power, larger interference
with administrative officers, and multiplication of the serious
consequences mentioned in the quotation from *Judd v. Fox
Lake, supra.*     It seems apparent that under the decisions of
this court the first action cannot be supported as a taxpayer's
action based upon the avoidance of a multiplicity of actions
at law or suits in equity.     The other ground averred in sup-
port of the complaint is, as said, based upon the claim that
each taxpayer of the state has an equitable proprietary inter-
est in the funds in the state treasury, or an interest of such a
nature that equity will recognize it and protect it by injunc-
tion against the constitutional fiscal officers of the state to
prevent them from paying out of such treasury funds for the
execution or administration of an unconstitutional law, under
the rule applied to municipalities in *Land, L. & L. Co. v. Mc-*

*Intyre,* 100 Wis. 245, 256, 75 N. W. 964; *Estate of Cole
(Mulberger v. Beurhaus),* 102 Wis. 1, 78 N. W. 402; and
other cases in this court. But the situations are not analo-
gous. The state is not to be put upon the level of a private
or of a municipal corporation. The former is the sovereign,
the latter the subjects. The courts have jurisdiction in an
action against a municipality as against a natural person.
They have no jurisdiction of actions against the state except
with the consent of the state expressed by the legislative
branch of the government and approved by the executive.
Unlike the federal constitution and the constitutions of most
of the states, the constitution of this state creates and recog-
nizes not three but four branches of government: legislative,
executive, administrative, and judicial. Administration is
logically and in most cases legally recognized as an exercise of
the executive power. The heads of the great administrative
departments of the United States government derive their
power from the grant of executive power in the federal con-
stitution and their lawful acts are treated as acts of the chief
executive, and in some instances an injunction against them
to prevent the enforcement of law challenged as unconstitu-
tional was put upon the same level as a like injunction against
the President. *Mississippi v. Johnson,* 4 Wall. 475; *Georgia
v. Stanton,* 6 Wall. 50, and cases in Rose's Notes. The ad-
ministrative officers named in art. VI of our state constitu-
tion are secretary of state, treasurer, and attorney general for
the state, and sheriffs, coroners, registers of deeds, and dis-
trict attorneys for the counties. Among the duties of the
secretary of state prescribed by the constitution is that "he
shall be *ex officio* state auditor." There is no general grant
of the whole administrative power to any one of or to all these
officers, and doubtless this and sec. 4 of art. V, which requires
of the governor that "He shall expedite all such measures as
may be resolved upon by the legislature, and shall take care
that the laws be faithfully executed," is sufficient authority

for the legislature to impose upon the governor and upon sub-
ordinate administrative officers like the state tax commission-
ers all necessary administrative powers not by the constitu-
tion vested in the administrative officers therein mentioned.
There is also found in our state constitution some express
limitations upon the power of the legislature over the funds
in the state treasury and some restrictions of that power by
necessary implication.   Instance sec. 18 of art. I, which pro-
vides that no money shall be drawn from the treasury for the
benefit of religious societies or religious or theological semi-
naries.   Also sec. 2, art. VIII, which forbids an appropria-
tion for the payment of any claim (except claims of the
United States and judgments) not filed within six years after
the claim accrued; and there are others.   *State ex rel. New
Richmond v. Davidson,* 114 Wis. 563, opinion of Dodge, J.,
at page 580, 88 N. W. 596, 90 N. W. 1067.   There are re-
strictions by necessary implication, as sec. 1, art. X, which
provides that the compensation of the superintendent of pub-
lic instruction shall not exceed the sum of $1,200 annually.
*State ex rel. Raymer v. Cunningham,* 82 Wis. 39, 50, 51 N.
W. 1133.   But these only accentuate the application to all
other treasury disbursements of the rule fundamental in pop-
ular representative governments that the popular branch of
the state legislature or the legislative branch of the govern-
ment shall control the public purse.   *Expressio unius est ex-
clusio alterius.*   In no system is the judiciary the guardian
of the public treasury except as the constitution by restrictions
upon legislative power in this direction may have so provided
that a judicial controversy not involving political discretion
may arise.   The manner in which appropriations of money
must be made is regulated, and there is a general provision,
recognizing the authority of the legislative branch of the gov-
ernment over the public funds, to the effect that no money
shall be paid out of the treasury except in pursuance of an
appropriation made by law.   There is in the instant case an

appropriation made by law, but it is contended that this appropriation, being made for the purpose of administering or carrying into effect an unconstitutional law, is itself unconstitutional.   What provision of the constitution does it conflict with if we suppose the premises correct?   The state legislature is not expected to find a grant of power to it in the state constitution.   Where there is no restriction it possesses the power.   *Comm. v. Plaisted,* 148 Mass. 375, 19 N. E. 224.   There is no such restriction upon the power of the legislature over the public funds.   On the contrary it may well be within the duty, at least it is within the discretion, of the legislature that all laws, even invalid laws, be enforced and thus brought to the test before the courts in the ancient, well understood, and lawful way.   But in any event the courts have no authority to interfere by injunction and thus forestall attempts to enforce the law.   This because the taxpayer has no interest in the funds in the public treasury to restrain these officers, and because the court has no power to create such an interest in the taxpayer, and because the court does not possess the power, where no constitutional interdict intervenes, to control the disbursements of public funds as against the legislative branch of the government.   But of this hereafter.

It further seems to me obvious that a suit by a taxpayer against such fiscal officers of the state, based upon the claim that a statute is unconstitutional, is a suit by a private person against the state, not going upon any apprehended destruction or confiscation of his property or clouding his title, as we say in legal phrase, not *quia timet* but ostensibly as champion of the public interests and in self-assumed protection of public funds, and really to avoid payment of the tax by arresting the power of the state in its attempt to execute the law by furnishing the funds for that purpose.   That this is a suit against the state is settled by authority here and elsewhere.   It falls within the rule of *State ex rel. Drake v. Doyle,* 40 Wis. 175, sixth paragraph of opinion, and the cases

there selected for approval. *Stephens v. T. & P. R. Co.* 100 Tex. 177, 97 S. W. 309; *Lord & P. C. Co. v. Board of Agriculture,* 111 N. C. 135, 15 S. E. 1032; *State ex rel. Hart v. Burke,* 33 La. Ann. 498; *Poindexter v. Greenhow,* 114 U. S. 270, 5 Sup. Ct. 903, and cases in Rose's Notes; and *Fitts v. McGhee,* 172 U. S. 516, 19 Sup. Ct. 269, are in point, and other cases can be found. Quoting from the last cited case:

"If, because they were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former as executive of the state was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes. That would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals, but it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons." See, also, *Ex parte Young,* 209 U. S. 123, 157 *et seq.,* 28 Sup. Ct. 441.

But there emerges here what is perhaps a larger question. To say that the courts have jurisdiction to review statutes at the suit of any taxpayer of the state who seeks to enjoin the payment of moneys out of the state treasury for the administration or enforcement of those statutes is to establish a general revisory jurisdiction in the courts over all legislation before any actual judicial or justiciable controversy has otherwise arisen. I may safely say that no statute is received with unanimous approval. A taxpayer may always be found. It is no answer to say that the court has a discretion as to when it will recognize this right of the taxpayer or issue its injunction. That only changes the principle which it is sought to engraft upon our form of government to the extent that we

are to modify the statement of it by saying: "The courts have
the power in their discretion to review all legislation," etc.
To my mind it is an obvious fallacy to say that this power or
this discretion extends only to the review of unconstitutional
statutes.   As well might one say that courts had jurisdiction
to try only guilty persons charged with crime.   The inquiry
proposed is whether or not the act in question is unconstitu-
tional, and it is to entertain such inquiry and decide it for or
against the validity of the statute that the jurisdiction exists
if it exists at all.   To recognize a power resident in the courts
by which that branch of the government could supervise leg-
islation in this way would be to create a radical change in our
plan of government as heretofore understood.   This must be
quite apparent to those who have extended their legal studies
beyond the *minutiæ* of adjudged cases and the rules of private
right and have acquired some knowledge of the principles of
government.   All revenue measures and most other statutes
involve some charge upon the public treasury for their admin-
istration.   All acts of the legislature involve the expenditure
from the state treasury of at least printing and publishing.
Therefore all statutes would at this preliminary stage be sub-
ject to judicial review.   In reply to a suggestion of this kind
from the bench one of the learned counsel for plaintiffs sug-
gested that this expense was so small that a suit would not be
entertained because *de minimis non curat lex*.   But this an-
swer overlooked the cases of *Mueller v. Eau Claire Co.* 108
Wis. 304, 84 N. W. 430, and *Chippewa B. Co. v. Durand,*
122 Wis. 85, 108, 99 N. W. 603, wherein it was held that the
court will not inquire into the amount or extent of the tax-
payer's interest so long as he is a taxpayer.   Besides, it over-
looked the consideration that in a republic founded upon the
equality of its citizens before the law it would be quite incon-
sistent with fundamentals to rest the jurisdiction to review
legislative acts at this preliminary stage of their existence
upon the wealth of the taxpayer who comes in to represent

himself and the public.   Nor can the amount of the charge
which the law imposes on the state treasury affect this ques-
tion, which is one of jurisdiction.   No statute gives the tax-
payer an interest in the funds in the state treasury.   The
courts must invent that species of property right if it is to
have recognition in the courts.   The courts also have consid-
erable discretion in granting or withholding injunctions.
This inevitably leads to the conclusion that the court is asked
to create or recognize a right not given by common law or stat-
ute and then exercise its discretion to issue an injunction to
prevent threatened invasion of this right, and all for the pur-
pose of making an occasion or an opportunity to review the
constitutionality of a statute at the preliminary stage of its
existence, before its enforcement is attempted and before any
controversy otherwise justiciable has arisen.   To do so would
conflict with the notion of constitutional law and the powers
of the judicial branch of the government with reference to
declaring laws unconstitutional announced in *Marbury v.
Madison,* 1 Cranch, 137, and many cases since.   It has been
said that courts never declare a statute unconstitutional, but,
being confronted with a judicial question which it may not
evade and with a constitution which commands one thing and
a statute which commands the opposite, they reluctantly and
unavoidably obey the paramount, not the subordinate, com-
mand.   The result of the grave duty thus forced upon the
court is unconstitutionality of the statute because it is inca-
pable of enforcement in the courts which speak last.   But here
we are asked not only to compare the statute with the consti-
tution, but to make the occasion for so doing, and to hold for
the purpose of enabling us to do so, by legislation, legal fiction,
or unprecedented judicial decision, that every taxpayer has
a proprietary interest in the funds in the state treasury.   The
controversy at this stage concerning the constitutionality of
a statute is the same which was or might have been presented
to the judiciary committees of the legislature or to the legis-

lature in session the same as that waged before the governor to induce him to veto the act. It is in the nature of an appeal from the legislative and executive branches of the government to the judicial.

"The theory upon which, apparently, this suit was brought is that parties have an appeal from the legislature to the courts; and that the latter are given an immediate and general supervision of the constitutionality of the acts of the former. Such is not true. Whenever, in pursuance of an honest and actual antagonistic assertion of rights by any one individual against another, there is presented a question involving the validity of any act of any legislature, state or federal, and the decision necessarily rests on the competency of the legislature to so enact, the court must, in the exercise of its solemn duties, determine whether the act be constitutional or not; but such an exercise of power is the ultimate and supreme function of courts. It is legitimate only in the last resort, and as a necessity in the determination of real, earnest, and vital controversy between individuals. It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act." *Chicago & G. T. R. Co. v. Wellman,* 143 U. S. 339, 12 Sup. Ct. 400.

See, also, *Charles River Bridge v. Warren Bridge,* 11 Pet. 420; *Georgia v. Stanton,* 6 Wall. 50; *Mississippi v. Johnson,* 4 Wall. 475. An injunction will not issue to restrain the execution of an unconstitutional law merely on the ground that it is unconstitutional. *Thompson v. Comm'rs,* 2 Abb. Pr. 248; *Birmingham v. Cheetham,* 19 Wash. 657, 54 Pac. 37; *People ex rel. Alexander v. District Court,* 29 Colo. 182, 68 Pac. 242. I am convinced that the decision below was correct and should be affirmed.

In the second suit a private citizen who is also a taxpayer seeks as relator to begin in this court an action by and in the name of the state against the secretary of state and state treasurer for the purpose of enjoining them from paying out funds from the state treasury for salaries and other expenses of ad-

ministering this law, and also against the members of the
state tax commission, enjoining the latter from exercising the
duties and powers conferred upon them by the act in question,
all upon the ground that this act is unconstitutional.  As
against the secretary of state and state treasurer the ostensible
purpose of the bill is to protect the state treasury; as against
the state tax commission the real purpose of relator to avoid
paying income tax is disclosed.  No steps have been taken to en-
force the law and the time for its enforcement has not arrived.
Application was by relator made to the attorney general to
begin and prosecute this suit, that official refused, and the re-
lator on this showing, with the usual averments of irreparable
injury, etc., seeks to arouse the original jurisdiction of this
court to entertain the suit, to put his private counsel in the
place of the attorney general to prosecute it, and to have the
state at this stage of existence of the statute enjoin its own of-
ficers from collecting its own revenue upon the averments
that the statute is unconstitutional.  The constitutional grant
of power to this court is that

"The judicial power of this state, both as to matters of law
and equity, shall be vested in a supreme court, circuit courts,
courts of probate, and in justices of the peace. . . ."
Art. VII, sec. 2.

"The supreme court, except in cases otherwise provided in
this constitution, shall have appellate jurisdiction only, which
shall be co-extensive with the state. . . . The supreme court
shall have a general superintending control over all inferior
courts; it shall have power to issue writs of *habeas corpus,
mandamus,* injunction, *quo warranto, certiorari,* and other
original and remedial writs, and to hear and determine the
same."    Art. VII, sec. 3.

That portion of the last above quoted section giving power
to issue the writs mentioned and to hear and determine the
same was construed to confer upon this court original juris-
diction of all judicial controversies within the scope of and
instituted by the issuance of such writs at common law, but

it was said that the court would only exercise the power thus
granted in controversies affecting the sovereignty of the state,
its franchises and prerogatives, or the liberties of its people.
It was also decided that the writ of injunction, found in this
section associated with the so called prerogative writs, might
also for this reason be employed to assert the prerogatives of
sovereignty.    Cases collected in *State ex rel. Lamb v. Cun-
ningham,* 83 Wis. 90, 53 N. W. 35. .Rules regulating the
exercise of the original jurisdiction as distinguished from the
appellate jurisdiction of this court, while appropriate and de-
sirable to facilitate our work, are not fundamental.    Power
is derived from the constitution, not from such rules, which
only operate to regulate the manner of its exercise.    They
merely serve to indicate when the parties litigant should ap-
proach this court in the first instance and when reach this
court by appeal or writ of error.    There is, I think, a marked
inconsistency between such cases as *State ex rel. Drake v.
Doyle,* 40 Wis. 175; *In re Hartung,* 98 Wis. 140, 73 N. W.
988; and *State ex rel. Stengl v. Cary,* 132 Wis. 501, 112 N.
W. 428; and other cases found in our reports and referred
to in the opinion written by Chief Justice WINSLOW herein.
I am quite satisfied with the opinion of the court in this re-
spect, but fear it will meet the usual fate of mere judicial
warnings and be again disregarded when a new exigency
arises.    The constitution vests in this court only judicial
power, thus excluding by implication political, administra-
tive, and legislative power.    The power to institute a suit by
and in the name of the state cannot logically be said to be
an exercise of judicial power.    It is rather executive or ad-
ministrative.    The attorney general, district attorneys, the
governor, and other officers possess this power although they
exercise no judicial power.    It is only by historical associa-
tions of the words "judicial power," as distinguished from
scientific definition, that the act of instituting a suit in court
in the name of the state can be called an exercise of judicial

power. Assuming it to be settled by precedent that the judicial power mentioned in our constitution is that power formerly exercised by the court of King's Bench and the Chancery courts in England, still that power fell short of authorizing an attack by suit upon the acts of co-ordinate departments of government by any writ before any legal controversy had arisen by the attempted execution of such acts. How then did this court acquire jurisdiction to authorize the institution of and then to entertain such a suit? Neither logical analysis of the term "judicial power" nor historical association warrants the exercise. The restriction of suits against the state is quite impotent if every taxpayer of the state, while he cannot make the state a defendant in his suit, may nevertheless make the state a plaintiff in a civil action against the same state officers to fight his battle for him. If these state officers represent the state in an action against them to restrain them from enforcing the law, they occupy the same legal position and make the same claims when this form of making the state plaintiff is complete. We can hardly say that the controversy has become a suit by the state against the state, for that would be absurd. We cannot liken the state to a trustee seeking the advice and direction of the court, for that presupposes a supervisory jurisdiction over the trust and in the court and begs the question. We cannot find an analogy in the governments of those states like Massachusetts where the governor or the legislature may call upon the court for an opinion in advance of enactment and of litigation, because there it is conceded that the courts in giving such opinions act not in a judicial but in a political capacity. *Opinion of Justices,* 126 Mass. 557, 566. Turn this as we will, we are always confronted with the fact that, whether the taxpayer is plaintiff or the state plaintiff, the suit involves a claim on the part of this court of power to revise and review acts of the legislature with reference to their constitutionality before any judicial controversy has arisen other than a con-

troversy nursed into life and existence by this court for the purpose of such revision. All that I have said and quoted with reference to the action in the name of the taxpayer on this point applies to this action. Of the two I would prefer the taxpayer's suit, because this is subject to the same weakness and also savors of subterfuge. Sovereignty is one and indivisible. But in the exercise of sovereign power all the great departments of government must concur. The manner of this concurrence is regulated by the division of governmental powers in the constitution and the limitations placed upon each department arising from this division or from express or necessarily implied restrictions found in the organic law. This sometimes impairs efficiency, but it promotes liberty. The most promptly efficient government is a despotism. It is the wisdom of the spendthrift which sacrifices future advantage for immediate gratification. The statesmen who founded the American republic understood these things and made deliberate choice between a government of liberty and one of temporary and prompt efficiency. The result thus far has justified their judgment. In the prevailing plan of government the guardianship of the funds in the public treasury, except when otherwise specially provided, is committed to the legislative branch of the government, which is responsible to the people. The judicial branch of the government is to take no part in political questions. In consummation of the exercise of the sovereign power it is to act last, and to act only when aroused by an actual judicial controversy. Until it comes before the court incidentally in such controversy, the question of the constitutionality of a statute is a political, not a judicial question. There is therefore no jurisdiction resident in the courts, as there is in the legislature and the governor, to declare an act unconstitutional in advance of a judicial controversy which necessarily involves that question. The court therefore has no jurisdiction to create such controversy by authorizing what is to my mind a fictitious suit in behalf

of the state against its own officers, where the ground for such a suit is that these officers are about to collect taxes under a general tax law.   That is merely a statement of the rule that what cannot constitutionally be directly done cannot be done by indirection.   The latter breaks down the American republican form of government as well as the former.   Examining from another viewpoint: In a case where a bounty was granted to manufacturers of sugar by Congress and the disbursing officer of the treasury refused payment under the belief that the act of Congress was unconstitutional, and the statute authorized a suit against the United States, an actual justiciable controversy thus arose.   But even here, and under a constitution carrying delegated power only, the supreme court of the United States decided, as set forth in the second paragraph of the syllabus:

"It is within the constitutional power of Congress to determine whether claims upon the public treasury are founded upon moral and honorable obligations, and upon principles of right and justice; and having decided such questions in the affirmative, and having appropriated public money for the payment of such claims, its decision can rarely, if ever, be the subject of review by the judicial branch of the government."   *U. S. v. Realty Co.* 163 U. S. 427, 16 Sup. Ct. 1120. Approved in *Allen v. Smith,* 173 U. S. 589, 19 Sup. Ct. 446, and cited in *State ex rel. Garrett v. Froehlich,* 118 Wis. 129, 143, 94 N. W. 50.

If we compare the instant case with the above we will find that here no justiciable controversy has arisen, but the court is asked to make one by authorizing a suit in the name of the state upon the petition of a taxpayer, and that here we are asked to decide in such suit that the legislature, which possesses all power not forbidden, had no power or discretion to make an appropriation of public moneys for the purpose of enforcing a statute passed by its legislature and approved by its executive.   I think this court has no jurisdiction so to do. For the court to decide before its judicial power is aroused

by a legal controversy is to assume a jurisdiction not given to it by law. I think the assumption of such jurisdiction changes the form of government as heretofore established and understood, and therefore we are justified in disregarding or overruling precedents in this court which might by mere logical inference seem to support this suit. I think we should have the courage to stop before taking this last step fraught with such consequences. In this connection I wish to mention the case of *State ex rel. Rosenhein v. Frear,* 138 Wis. 173, 119 N. W. 894, which was a motion for leave to bring suit in the name of the state. When that motion was presented it will be remembered by those present that I protested vigorously from the bench against countenancing any such proceeding. I thought then and I still think that the suit there suggested was preposterous. If the legislature of Wisconsin had not been a body of rather feeble temper it might not be entirely discreet for judicial officers to assert the right to launch and determine such a suit. But the motion was denied, and I regret to say that I gave no careful attention to the language of the opinion denying the motion and neglected to dissent therefrom. I do not think either that the complaint states a cause of action in favor of the state and against its officers. The mere fact that taxes will be collected from a large number of its citizens by the state authorities for the state creates no actionable wrong against the state. All general laws affect all the people of the state and all police regulations curtail their rights or liberties to some extent. But this gives no right of action to the state. Neither can a general tax law, be it ever so new. The notion that the state has a right of action to test such laws is, to say the least, very novel. Nor does the fact that a law which appears on its statute books and is about to be enforced at some expense upon the state treasury do so. It is the legal and constitutional way in which to handle a law whether that law be valid or invalid. It is the proper mode of getting that law before

the courts.   It merely amounts to saying that the officers of the state are about to enforce the state statutes in such manner as to create justiciable controversies which will thus come before the court in the ancient, established, and orderly way. Surely such attempt is not actionable.   If the statute is valid it is their duty to enforce it, and it is in any event their duty to obey it until it is held to be invalid by the judicial branch of the government in a judicial controversy of which the latter branch has jurisdiction.   If the legislature has discretion to recognize merely moral obligations and appropriate money for their payment, it surely may appropriate money for enforcing even a void act and thus bringing it to the judicial test in an actual controversy.   It may be that in the march of progress and the evolution of governments the change in the plan of our government created or confirmed by the decision herein is inevitable.   But I mistrust, and I think not through timidity, the steady progress of this court always in the direction of grasping more power.   This will establish the judiciary as a political branch of the government and displace it from that place of dignified impartiality which it has so long and so successfully filled.   This extension of power is the progress which has always resulted in the wreck of human institutions.   I have now made my protest against it in *In re Appointment of Revisor*, 141 Wis. 592, 124 N. W. 670; in *State ex rel. Kustermann v. Board of State Canvassers*, 145 Wis. 294, 130 N. W. 489; in *State ex rel. Rosenhein v. Frear, supra*; in *Lawler v. Brennan*, —— Wis. ——, 134 N. W. 154, and in the instant case, and so discharged what I conceive to be my duty.   In any view of the case, even that taken in the majority opinion, it seems to me the second action should be dismissed for want of jurisdiction as against the secretary of state and the state treasurer.   But I consider that this court has, under the constitution of this state, no jurisdiction to review the statute at this stage of its existence and in this way in either case.   The assumption of the jurisdiction so to do

cannot be justified upon the comparative futility of such review demonstrated by the result in this case.

MARSHALL, J. I concur in the decision and in the stated general character of this court's original jurisdiction, viz.: that it is wholly of a prerogative character, to be exercised in the name of the sovereign,—the state, standing for the people as an entirety.

I concur that prerogative judicial jurisdiction under the constitution is reserved, wholly, to this court, and that an ordinary taxpayer's action to vindicate private rights is entirely outside of that field.

I do not concur in the view that the circuit courts have no jurisdiction of taxpayer's actions to enjoin illegal disbursements or waste of state money under the guise of an unconstitutional legislative enactment. The jurisdiction of such circuit courts is as boundless under the constitution, as to all ordinary matters, as can be the violations of legal or equitable rights. It was lodged there by the people in the beginning. It cannot be given, taken away, or modified, legitimately, by any fiat of this court or in any way except in the manner pointed out in the fundamental law without invading the field of usurpation.

The historical treatment of this court's administration of its original jurisdiction is not to be taken, I apprehend, as intended to indicate that its power is fenced about by mere precedents, or at all, except by the broad prerogative purposes of the grant. So far as the classification of precedents illustrates the general nature of the jurisdiction respecting what is and what is not within the field of prerogative purpose, it is very valuable but should be regarded, I think, in that light only. Any situation calling for remedial activity which falls within the prerogative field falls within the original jurisdiction of this court, regardless of whether there is any precedent to fit the case; but whether such jurisdiction should be exer-

cised or not in any given case must, necessarily, rest, more or less, in judicial discretion.

I do not concur in the restrictive character of the decision. I think the court should meet now and decide now, plainly and permanently, each of the important questions discussed by counsel, which, obviously, must be decided by this court sooner or later, and the earlier the better for all concerned. Any delay I think should be avoided, if possible, thus obviating the occurrence of a period of uncertainty characterized by expensive litigation and business disturbance attributable to failure by this court to grapple now, after the full argument had, efficiently with the matters referred to. Judicial progress along that line is the correct judicial policy. It is wholly within the court's power to so progress. It is the need of the times. The whole people of the state, as it were, are before this court in this case invoking it to make a full decision. It is due to them to respond as effectually as practicable.

At some future time I will substitute for this brief memorandum an opinion in support of the suggestions made.

The following opinion was filed March 15, 1912:

MARSHALL, J. I fully determined to write, at length, in substitution for the above. On further reflection it seems to do so might give unwarranted dignity to some suggestions voiced in these cases which were, as is supposed, effectually foreclosed more than a century ago, and so are not, generally, and should not, efficiently, be deemed open for discussion.

After the uniform holdings here, through many important adjudications, that public money in the public treasury, is a subject of trust for all the people for public purposes and disbursable, only, pursuant to valid legislation, and that every taxpayer is a *cestui que trust* having sufficient interest in preventing abuse of the trust to be recognized in the field of this court's prerogative jurisdiction as a relator in proceedings to set sovereign authority in motion by action in the name of

the state for prevention or redress, any suggestions to the contrary, however well supported as an original proposition, might well have but a passing notice. The same is true of the question of whether an action against a state officer to prevent disbursement of public money in the enforcement of an invalid act of the legislature is against the state in any proper sense. It has been held over and over again, in terms or in effect, that such an action is to be regarded as against the person in his individual, not his official capacity, and so not against the state,—so held very recently most significantly by the supreme court of the United States. *Ex parte Young,* 209 U. S. 123, 28 Sup. Ct. 441, followed here in *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W. 885.

It is essential to strictly maintain here the foregoing stated principles. Only by so doing can this court fully perform its great function as the supreme efficient conservator, defender, and preserver of the inherent and guaranteed rights of the people. The court will not swerve from the proper course for which it was given independent status, "through fear, favor, affection, or hope of reward." I know every member of it is firm in that. No unreasonable impatience elsewhere, if such exists, will be permitted to interfere with the sturdy performance of constitutional duty here. While paying due deference to co-ordinate departments it must expect that deference in return. There must be no hesitation through fear of censure or thought of tuning the judicial harpstrings to harmonize with temporary conditions, as we hear advocated outside at times. In that there is no division of sentiment here.

I have too much respect for the lawmaking power to indulge the idea that there is any dominating thought there hostile to the willing performance of duty here to test enactments by constitutional restraints on all proper occasions, and put the stamp of judicial disapproval thereon when manifestly required because of the enactment being evidently not law in fact though law in form; and too much respect for

the average legislative sentiment not to see through the vista
of momentary impatience,—sometimes exhibited, at the fail-
ure of legislative effort,—to the considerate judgment of after
reflection which may always be depended upon to approve and
honor full performance of judicial duty to appreciate that
when there is a conflict between an act and the constitution,
as seems to the court created to view the matter, it must de-
cide between them and "as the constitution is superior to any
ordinary act of the legislature the constitution and not the
ordinary act must govern the case to which they both apply."
*Marbury v. Madison,* 1 Cranch, 137. On the other hand,
I have too high regard for the great trust reposed in the in-
strumentalities chosen for now to give vitality to the judicial
function, to think that, if there be any considerable sentiment,
momentarily, elsewhere inimical to full performance of duty
here, it can exert efficient influence in that regard. Gen-
erally speaking, I apprehend the sentiment of the public is
in favor of a prompt, thorough treatment of constitutional
questions as they arise. The people want to know, and have
a right to know and legislative instrumentalities desire to
have them know, at the earliest practicable moment, just
where they stand with reference to important new, far-reach-
ing enactments.

The fundamental law, as it has been construed, and the
function of this court as to applying the rule of the constitu-
tion to legislative enactments and using its prerogative power
against any one assuming to act for the state who would other-
wise interfere with guaranteed rights under the guise of an
invalid enactment, must be maintained. No one can win en-
during fame by failing to appreciate that and be ready to vig-
orously vindicate it.

The court, with practical unanimity, reached the conclusion
that all constitutional questions presented and argued in the
cases, in some one of them, were within the court's power to

consider and decide; but to what extent to respond was within its discretion. That left much to judicial propriety, convenience, exigency, and expediency, resulting in the court going only so far as was vital to the existence of the commission with power to enforce the dominating features of the law. Not to go that far was thought would be well nigh, if not quite, abuse of discretion; not doubting competency to go further and decide all important questions so ably discussed. Obviously, there is left a broad field for very much and very perplexing litigation, to the probable great prejudice of public and private welfare. The field so left untouched was as fully covered by eminent counsel as it is liable to ever be. The whole crop of legitimate controversies was fully ripe for the judicial harvest. All interests called loudly for the chosen instrumentality for the work to grapple with the proffered task. In my opinion, the waste of energy and expense attributable to failure to do so might well have been avoided. It was according to precedent to take the course adopted, I confess. But should precedent efficiently bar the wheels of progress toward a more full response to such an appeal for judicial determination? It seems not.

This court can well view with satisfaction its progressive course as to meeting judicial controversies, squarely, casting aside the ancient method of dilatory, fencing, mere piece-meal decision, delaying the finality by technical dispositions, depleting to public and private resources and disappointing and exhausting to those resorting to the courts for redress and prevention of wrongs. There is room for further progress. Impatience with the law's delays, sometimes significantly manifested, will disappear without any change in the law of procedure by changes of method within the province of the court to make of its own motion, demonstrating that the fault supposed to exist is, in the main, in the administration of the law rather than in the law itself.

Seeming opportunity for worth-while progress is most inviting in cases like those before us. Where a new law which is questioned as to its meaning and its legitimacy in many important minor features as well as the dominant one,—a law of far-reaching character, materially affecting the people generally and bristling with complications, each presenting, from some reasonable standpoint, serious difficulty,—is brought early here for examination in all such aspects,—brought by the exercise of prerogative power so that all the people, as it were, are represented at the bar to the end that the enactment, so far as valid, may be vigorously enforced and cheerfully submitted to, and the mischiefs ordinarily flowing from such a course for a time and the law then being found full of infirmities, may be avoided, why should not the earliest opportunity afforded be willingly taken to carry the whole mass of things to the consultation room and patiently and finally solve the uncertainties, thus promptly affording peace to the state and its people in respect to the matter? The power exists to do it. Universal acclaim is in favor thereof. We are here to vitalize the power intrusted to us to do it. We have time therefor. We are as able now for the task as we probably ever will be. If we have not had as efficient help as we are likely to have at any future time, the power is ample to call for and obtain further assistance from eminent advocates of opposing theories. Then why hesitate? Is there any good reason for it?

I cannot perceive any satisfactory answer in the affirmative to the foregoing. Hesitation is largely from judicial custom to delay grappling with questions so long as possible, with the thought that time will either render doing it unnecessary or a decision may perhaps be later made under more favorable circumstances, and habit to minimize judicial labor where practicable without affecting the grade of it, to the end that each of the controversies brought here may have its due

proportion of attention. I confess the court's burdens are heavy and that the easiest way of escape from danger, if any exists, of which I must say I am not conscious of its being unduly so, is by limiting decisions to actual necessities of cases as they arise. That was for a time given as a sufficient justification for limiting activity of prerogative jurisdiction to a very narrow field and limiting it therein to the essentials of each particular situation. *State ex rel. Board of Ed. v. Haben,* 22 Wis. 101; *In re Court of Honor,* 109 Wis. 625, 85 N. W. 497.

While the scope of the prerogative power was early definitely stated and it has thus been maintained, if the burden of work here was ever a legitimate excuse for not exercising jurisdiction, within such scope, to make a full decision in a case thought to be of a character to warrant the court in stepping aside from its ordinary labor to entertain it at all, that ended long since. When such doctrine took root there were but three members of the court and the equipment for labor was very crude compared to that now afforded. There is certainly no longer need for leaving anything undone which might properly be done because of the burden of work.

So again the inquiry is suggested, why should not the court in all cases of great public interest, make the fullest practicable decision instead of leaving as much ground uncovered as practicable? In such a situation as this it seems that the court should not cease its labors till the whole subject in all important details shall have been exhausted. If any such shall not have been fully presented, or been overlooked, opportunity should be given, if help can be reasonably expected thereby, for further discussion at the bar, so in the end that the court may furnish executive officers and the people a plain, certain guide to go by. I urged that at first and again on the motion for rehearing. There are many important questions left undecided. Each may furnish ground for expensive liti-

gation.    To settle all in detail will require large public and
private expenditure which must be charged to waste.    Con-
servation of time and money and peace, avoiding all such
waste, can be effected by just a few days more time now,
which could well be spared to devote to the matter.

A motion for a rehearing was denied March 12, 1912.